Nos. 24-1324, 24-1409

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

NATERA, INC.,

*Plaintiff-Appellee*,

v.

NEOGENOMICS LABORATORIES, INC.,

*Defendant-Appellant*.

Appeals from the United States District Court for the Middle District of North Carolina, No. 1:23-cv-00629; Hon. Catherine C. Eagles

## NEOGENOMICS LABORATORIES, INC.'S REPLY IN SUPPORT OF EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

DARALYN J. DURIE
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

JOHN FRANKLIN MORROW, JR.
WOMBLE BOND DICKINSON
One West Fourth Street
Winston-Salem, NC 27101

DEANNE E. MAYNARD
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8740
DMaynard@mofo.com

*Counsel for NeoGenomics Laboratories, Inc.*

FEBRUARY 20, 2024

# CERTIFICATE OF INTEREST

Counsel for NeoGenomics Laboratories, Inc. certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

NeoGenomics Laboratories, Inc.

2. **Real Parties in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

NeoGenomics, Inc.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.

WEIL, GOTSHAL & MANGES LLP: August Melcher; Patrick Lyons; Elizabeth Ryan; John J. Nolan

WOMBLE BOND DICKINSON (US) LLP: John D. Wooten IV

MORRISON & FOERSTER LLP: Matthew Kreeger; Annie Lee; Charles Calhoun Provine; Eric Nikolaides; Hui Zhao; Jack William Haisman

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)? If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).

Yes, see separately filed notice.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated:  February 20, 2024                    /s/ Deanne E. Maynard
                                                        Deanne E. Maynard

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ............................................................... iv

INTRODUCTION ....................................................................................1

ARGUMENT ...........................................................................................2

    A.    The Preliminary Injunction Is Unlikely To Survive Appeal ................2

        1.    The district court applied the wrong legal standard on obviousness and made unsupported findings ............................2

            a.    Natera's vulnerable claims ............................................2

            b.    Legal errors ....................................................................3

            c.    Clear factual errors ........................................................5

        2.    The district court legally erred in determining irreparable harm divorced from claim scope and made unsupported findings.................................................................................7

            a.    No nexus to claimed feature ...........................................7

            b.    Natera's delay .................................................................9

            c.    Natera's lack of harm ...................................................10

        3.    The district court overlooked harm to cancer patients and research ......................................................................................11

    B.    The Equities Favor A Stay ...............................................................13

CONCLUSION ......................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allergan v. Apotex*,
  754 F.3d 952 (Fed. Cir. 2014) ....................................................3

*Amazon.com v. Barnesandnoble.com*,
  239 F.3d 1343 (Fed. Cir. 2001) ...............................................2, 5

*Apple v. Samsung*,
  695 F.3d 1370 (Fed. Cir. 2012) ...............................................8, 9

*Ariosa Diagnostics v. Sequenom*,
  788 F.3d 1371 (Fed. Cir. 2015) ..................................................5

*Axonics v. Metronic*,
  73 F.4th 950 (Fed. Cir. 2023) ....................................................4

*Berkheimer v. HP*,
  881 F.3d 1360 (Fed. Cir. 2018) ..................................................5

*CareDx v. Natera*,
  40 F.4th 1371 (Fed. Cir. 2022) ................................................5, 6

*Concrete Appliances v. Gomery*,
  269 U.S. 177 (1925)..................................................................4

*Hybritech v. Abbott*,
  849 F.2d 1446 (Fed. Cir. 1988) ................................................11

*KSR Int'l v. Teleflex*,
  550 U.S. 398 (2007)..................................................................5

*Nat'l Steel Car v. Canadian Pac. Ry.*,
  357 F.3d 1319 (Fed. Cir. 2004) ..................................................5

*Robert Bosch v. Pylon*,
  659 F.3d 1142 (Fed. Cir. 2011) ................................................13

*Stemple v. Bd. of Educ.*,
  623 F.2d 893 (4th Cir. 1980) ....................................................10

**Other Authorities**

Maira Coakley, et al., *Comparison of Circulating Tumor DNA Assays for Molecular Residual Disease Detection in Early-Stage Triple-Negative Breast Cancer*, 30 Clinical Cancer Rsch. 895 (2024), http://tinyurl.com/coakleystudy .........................................................................12

Amended Answer, *Guardant Health v. Natera*, ECF90, No. 3:21-cv-004062 (N.D. Cal. Sept. 7, 2021) .....................................11

# INTRODUCTION

NeoGenomics showed a clear-cut need for a stay. The paramount public interest in continued access to NeoGenomics' highly sensitive cancer test alone justifies one. Natera tellingly waits 20-plus pages before directly addressing that interest, and never rebuts that its own product is insufficiently sensitive to replace RaDaR for certain patients and studies.

On top of that, a preliminary injunction—especially one disturbing the pre-litigation status quo—is a drastic and extraordinary remedy requiring a forceful showing by the plaintiff, both of no substantial question of liability and of significant and immediate irreparable harm. Natera made neither showing. Its weak (at best) patent claims, its lack of any substantiated existing or expected injury, and the serious harms being inflicted on the public and NeoGenomics warrant a stay. Natera never justifies depriving patients, doctors, and scientists of a cancer test that has been available for years—particularly one that derives its sensitivity from features not claimed by the '035 patent (nor from using a "single volume reaction," which Natera belatedly alleges is the key distinction from prior art).

The preliminary injunction should be stayed.

# ARGUMENT

## A.    The Preliminary Injunction Is Unlikely To Survive Appeal

### 1.    *The district court applied the wrong legal standard on obviousness and made unsupported findings*

#### a.    *Natera's vulnerable claims*

The evidence of obviousness is far more than needed to establish "[v]ulnerability." *Amazon.com v. Barnesandnoble.com*, 239 F.3d 1343, 1358-59 (Fed. Cir. 2001).  The district court never disagreed that Kaper, combined with knowledge in the field, discloses every claim limitation.  Add1316-1317 (Natera disputing only motivation, reasonable expectation, teaching away).  It hinged its decision solely on motivation to use cell-free DNA with reasonably expected success.  Add9-10.

But the evidence on that issue was compelling too.  Among other things, Natera and its expert Dr. Metzker already admitted techniques just like Kaper's—including tagging DNA with "markers," "performing a selective amplification of SNPs," and "sequencing"—were routinely and conventionally applied to "circulating cfDNA" by at least 2009, well before the alleged 2011 priority date.  Add975-976, Add982-983; Mot.12-13.  Natera trots out assertions in this case from Dr. Metzker but never even tries to reconcile his past admissions.  Opp.13.

### b.    Legal errors

Rather than rebut vulnerability, Natera knocks down straw-man arguments NeoGenomics never made, such as whether "vulnerability" and "substantial question" of invalidity are "different" (they are not) or whether motivation and reasonable expectation may be "relevant" at the preliminary-injunction stage (they may).  Opp.8-11.  NeoGenomics' point was that the district court legally erred by demanding more than a substantial invalidity question and also by treating as dispositive alleged "obstacles to successfully amplifying and sequencing cfDNA *with precision*."  Add9-10 (emphasis added).  As Natera never contests, the claims require no level of precision (Opp.11-12)—making the district court's "failure to consider" the claims' "appropriate scope" "legal error."  *Allergan v. Apotex*, 754 F.3d 952, 966 (Fed. Cir. 2014); Mot.14-15.

Natera has no response to *Allergan*, which it never acknowledges.  Natera instead tries to recast the district court's finding to be that "Kaper's Access Array was understood to be too imprecise to be useful with ctDNA," which Natera likens to finding that "cost or safety" defeat motivation.  Opp.11-12.  But Natera cites nothing, neither the district court's decision nor any evidence, for that imagined proposition about Kaper.  The district court never disagreed that if any level of precision suffices, skilled artisans would and could have used Kaper with cell-free DNA; it simply demanded more than is claimed, requiring that the combination

"successfully amplify[] and sequenc[e] [circulating-tumor]DNA with precision."
Add10. But the proper "inquiry is 'whether a skilled artisan would have been
motivated to combine the teachings of the prior art references to achieve *the claimed
invention*.'" *Axonics v. Metronic*, 73 F.4th 950, 957 (Fed. Cir. 2023) (Court's
emphasis). None of Natera's cited decisions excuses that legal error; two *reject*
patentee arguments against motivation. Opp.11-12.

Natera's recasting of the district court's legal error as a supposed finding about
Kaper's shortcomings also fails because Kaper expressly teaches that Access Array
is ideal for samples with miniscule DNA amounts ("50ng"), less than the '035 patent
describes for cell-free DNA ("80" or "250ng"). Add1129-1133;
Add453(col.222:21-35). Plus, the district court predicated its likelihood-of-
infringement determination on an article by Forshew—an Inivata co-founder—
describing use of Access Array with cell-free DNA. Add6. Yet as Natera never
contests (Opp.13), Forshew was submitted for publication just months after the
alleged priority date and before Natera's application was public. Supp.Add292;
Mot.8-9. Such "independent" development "within a comparatively short space of
time" is "persuasive evidence" of obviousness. *Concrete Appliances v. Gomery*, 269
U.S. 177, 184-85 (1925). And since Forshew allegedly describes RaDaR, it also
disproves Natera's unsupported "copycat" label. Opp.1.

### c.    *Clear factual errors*

Natera also cannot overcome the district court's clear factual errors.  It hides behind the clear-error standard as if this appeal follows a merits trial, arguing the record at least "plausibl[y]" supports "ultimate findings" on motivation and reasonable expectation.  Opp.13-16.  But the district court made no ultimate findings at this preliminary stage, and what Natera had to prove was different:  the absence of a substantial question of invalidity.  *Nat'l Steel Car v. Canadian Pac. Ry.*, 357 F.3d 1319, 1324-25 (Fed. Cir. 2004).  In this context, the "existence of conflicting evidence" on obviousness can show clear error (*contra* Opp.15-16), or legal error in applying too high a bar.  *Amazon.com*, 239 F.3d at 1358-59.

None of Natera's evidence establishes it carried its burden.  Natera cannot escape its own prior admissions and judicial success in proving that tagging, amplifying, and sequencing cell-free DNA—the very things the district court thought "presented obstacles" (Add10)—were routine, conventional technology before 2011.  Opp.15; Mot.2,4-5,15-16.  Mostly ignoring its and its experts' prior statements, Natera tries to dismiss the holdings in *CareDx* and *Ariosa* as "concern[ing] subject-matter eligibility."  Opp.15.  But those decisions are relevant because of what they show about the state of the prior art, especially because the routine-and-conventional standard "goes beyond what was simply known in the prior art."  *Berkheimer v. HP*, 881 F.3d 1360, 1369 (Fed. Cir. 2018).  Nor can they

be dismissed as "involv[ing] different evidentiary records" (Opp.15): the decisions and Natera's prior admissions are part of the record here, including Natera's *CareDx* expert report. Reply.Add1-120. And although Natera labels those decisions and admissions "*post*-priority-date statements," it never contests they describe the *pre*-priority state of the art. Opp.15 (Natera's emphasis).

Natera shifts to "findings" the district court never made about the alleged "innovation" of "amplifying multiple targets *together in a single reaction volume*" to "overc[o]me" problems. Opp.3,12-16 (Natera's emphasis). The '035 patent admits that was not new: "the general belief in the art" was that amplifying multiple targets was already feasible up "to about 100 assays in the same well." Add366(col.48:25-29), Add385-386(col.85:14-16,col.87:29-57) (similar). The patent purports to address only a need for "more than 100," "500," "5,000" or more targets. Add386(col.87:29-57). Yet it claims amplifying as few as "25" "in a single reaction volume." Add467(col.249:44-62). And Natera admits that Kaper teaches amplifying "up to 10 loci in each reaction volume"—which hardly teaches away from using a single reaction volume, a finding the district court never made nor "credited." Opp.14.[1]

---

[1] The hearing was not "evidentiary" (Opp.5), it was "oral argument," without new evidence. Add10 n.5; Add1718-1729.

For that reason, Natera's insistence on a motivation directed at "*this*" "*specific method*" fails. Opp.12-16 (Natera's emphasis). The only thing the district court found missing from Kaper was applying the known claim steps to cell-free DNA. Add9-10. But the already routine nature of those steps and the undisputedly well-known potential for using cell-free DNA to detect cancer provided ample motivation with reasonably expected success—which is exactly what Forshew shows happened within a year after Kaper and roughly contemporaneously with the alleged priority date. Supp.Add292. Contrary to Natera's assertion (Opp.6), NeoGenomics' expert explained this same motivation. Add838-839. Natera also overlooks that "any need or problem known in the field" at the time "and addressed by the patent" suffices; a requirement for teachings directed specifically at the claimed combination has long-since been rejected. *KSR Int'l v. Teleflex*, 550 U.S. 398, 420 (2007).

These errors on obviousness alone require a stay.

### 2. *The district court legally erred in determining irreparable harm divorced from claim scope and made unsupported findings*

#### a. *No nexus to claimed feature*

On irreparable harm, Natera is starkly silent about the district court's fundamental error: tying its determination to an unclaimed feature, tumor-informed testing. Add14-18; Mot.16-18. Natera never disputes tumor-informed testing is not a claimed feature. Opp.16-21. But the distinction between tumor-informed and tumor-naïve testing was the district court's basis for Natera's purported "first mover

advantage" and "exclusivity" period. Add15. It was the basis for speculating that "[i]f forced to compete" Natera "could lose out on partnerships," and for the purported nexus to the alleged infringement. Add15,17-18. And it was the basis for treating this as a two-player market. Add14-18. The district court thus did what this Court prohibits: allowed Natera "to leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Apple v. Samsung*, 695 F.3d 1370, 1374-75 (2012). That legal error warrants a stay.

The closest Natera comes to defending this legally improper focus is asserting (based on a district-court decision) that harm can be tied to unclaimed features "where a patent covers a product's entire workflow." Opp.19. There is no such rule, nor would it apply here anyway. NeoGenomics achieves a highly sensitive, tumor-informed test because of what it does before and after the basic cell-free-DNA-processing steps accused of infringement. Before processing any cell-free DNA, a sample of a patient's tumor is collected and sequenced. Add678(¶10). NeoGenomics uses a proprietary bioinformatics algorithm to design a patient-specific primer panel from that sample to identify up to 48 tumor-specific variations (Signatera identifies merely 16). Add678-696(¶¶10,39,44). Only then is cell-free DNA amplified or sequenced. Add678-696(¶¶10,39,44). After sequencing, NeoGenomics applies its own post-sequencing analytics, which are also key to RaDaR's confirmed sensitivity. Add678-696(¶¶10,39,44).

The only part of this "workflow" that allegedly infringes is using PCR to tag, amplify, and then sequence the DNA with a commercial sequencer—not RaDaR's patient-specific steps.  Supp.Add256-78.  Without support, Natera calls those steps "central to RaDaR's workflow."  Opp.19.  But *Apple* rejected a similar argument, refusing to hold a feature "core" and a demand-driver "simply because removing" it might leave a product "less valued or inoperable."  695 F.3d at 1376.  Even Natera concedes the "'035 [p]atent does not cover every conceivable method of testing [cell-free]DNA" but only one "*specific method*."  Opp.14 (Natera's emphasis).  And although Natera baldly states "NeoGenomics advertises" patented features (Opp.19), Natera merely cites statements that RaDaR "is 10x more sensitive than" other tests, which is not a result of allegedly infringing activity.  Supp.Add154-56(¶143).  Notably, Natera never argues its purported innovation—using a "single reaction volume"—drives sales of RaDaR or Signatera.  Opp.16-21.

### b.    *Natera's delay*

Also defeating irreparable harm is Natera's significant delay, which it cannot explain away.  Natera does not dispute: (1) it claimed the purported invention here only after RaDaR was on the market, and (2) voluntarily delayed seeking relief until seven-plus months after the patent issued, three-plus years after RaDaR became available.  It asks the Court to excuse that delay because RaDaR initially lacked Medicare approval.  Opp.20-21.  But Natera, like the district court, repeatedly relies

on alleged harms in the non-Medicare market for biopharmaceutical partnerships and clinical studies, the market RaDaR entered in 2020. Opp.16-21. Because of Natera's delay, its request to remove RaDaR from the market seeks a change in the pre-dispute status quo, particularly disfavored relief that requires a heightened showing. *Stemple v. Bd. of Educ.*, 623 F.2d 893, 898 (4th Cir. 1980). Without disputing that standard applies, Natera's response never tries to meet it.

### c.     *Natera's lack of harm*

Natera's remaining arguments recycle flawed reasoning NeoGenomics rebutted. Natera cannot chalk up lack of lost sales and contracts to recent market entry because RaDaR has been available for years. Natera wrongly states the district court found it "lost business" from AstraZeneca (which the district court never mentioned) and Moderna. Opp.17. But Natera never rebuts evidence showing Signatera's reduced sensitivity meant it "would not have been eligible" for either. Add687-690(¶¶28-32). Nor were Natera's CEO's statements "cherry-pick[ed]" (Opp.17-18); they speak for themselves and were made after RaDaR was on the market, including with Medicare approval: "We very, very rarely see any competitors in the field" because "we're at these very early stages in very big underpenetrated markets." Add707,720. The "only" competitor is "Guardant Health." Add716. Elsewhere, Natera seeks a Lanham-Act injunction to prevent

10

Guardant from "erod[ing] [Natera's] market share." *Guardant Health v. Natera*, No. 3:21-cv-004062, ECF90 (N.D. Cal.).

The district court also misinterpreted precedent in giving undue weight to whether the market is two-player. Mot.18-19. Natera says only that the district court did not give "dispositive weight," never defending its reading of precedent or the weight it gave. Opp.18 (citing Supp.Add456). Regardless, the tumor-informed market is not two-player but includes "the majority of the publicly-traded players" plus non-public ones. Add526,543-550; Supp.Add371.[2]

### 3.    *The district court overlooked harm to cancer patients and research*

The "focus" of the "public interest analysis should be whether there exists some critical public interest that would be injured." *Hybritech v. Abbott*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). A critical public interest is being injured here: for some patients and studies, RaDaR is the only option because of its sensitivity and features. Mot.21-24.

Natera points to no evidence rebutting that fact. It concedes sensitivity is "one factor oncologists consider" but complains of a lack of "head-to-head studies" and about NeoGenomics' reliance on an executive's affidavit. Opp.22-23. Yet Natera

---

[2] Contrary to Natera's suggestion (Opp.18 n.2), Invitae's product is available now, notwithstanding any bankruptcy. Add1974.

never contests that executive's well-supported statements. Nor does Natera address head-to-head evidence: a prominent oncologist recognized "RaDaR is more sensitive than Signatera" and thus "important" for certain cancers; and a key opinion-leader reported positive results with RaDaR while advising against Signatera. Add672-673; Add734-741. Recent peer-reviewed research confirms higher sensitivity matters for "clinical impact," reporting RaDaR detected circulating-tumor DNA at as low as .0011% variant allele frequency. Coakley, *Clinical Cancer Research* (2024), http://tinyurl.com/coakleystudy (cited, Add2026). Signatera's theoretical limit (.01%) is less sensitive. Add695-696(¶44). Natera's cited survey (of just 14 oncologists) confirmed patient and clinician choice is important—and over 35% did not agree that Signatera is "preferred." Supp.Add.369. Thus, although Natera repeats the district court's statement that patients "will be able to get" Signatera, it never rebuts Signatera's inadequacy for certain uses. Opp.22-23 (citing declarations merely making other points).

Natera undermines its own asserted irreparable harm. According to Natera, the public is fully protected because the injunction allows "virtually all ongoing use of RaDaR," and "hypothetical impacts on potential future studies" are "speculat[ion]." Opp.2,23. Yet Natera simultaneously argues it needs the injunction to prevent losing future studies to NeoGenomics. Opp.16-22. Actually, the unrebutted evidence shows Signatera cannot substitute for RaDaR—so while the

threat to future studies is real, only the public and NeoGenomics face harm. *Supra* pp. 10-11.

### B.    The Equities Favor A Stay

As NeoGenomics showed, harms to the public and NeoGenomics outweigh any comparable threat to Natera.    Mot.24-25; Opp.21 (wrongly asserting uncontested).  Natera cites the short time needed for appeal.  Opp.23-24.  But that favors preserving the status quo, which Natera no longer contests is with RaDaR on the market.

Nor does NeoGenomics' broader portfolio justify discounting the real harms to its substantial research-and-development investments:  whether harm "affects only a portion of a [party's] business says nothing about whether that harm can be rectified." *Robert Bosch v. Pylon*, 659 F.3d 1142, 1152 (Fed. Cir. 2011); Mot.24-25.

### CONCLUSION

The preliminary injunction should be stayed.

Dated:  February 20, 2024

Respectfully submitted,

DARALYN J. DURIE
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

JOHN FRANKLIN MORROW, JR.
WOMBLE BOND DICKINSON
One West Fourth Street
Winston-Salem, NC 27101

/s/ Deanne E. Maynard
DEANNE E. MAYNARD
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.:  (202) 887-8740
DMaynard@mofo.com

*Counsel for NeoGenomics Laboratories, Inc.*

13

# REPLY ADDENDUM

**NATERA, INC. v. NEOGENOMICS LABORATORIES, INC.**

**Nos. 24-1324, -1409 (Fed. Cir.)**

**REPLY ADDENDUM TABLE OF CONTENTS**

| Date | Dkt. | Document | Reply.Add |
|------|------|----------|-----------|
| 10/19/2023 | 97-20 | Exhibit 20 – Quackenbush Declaration - *CareDx v. Natera* (D. Del.) | Reply.Add1 |

# Exhibit 20

**APPENDIX A**

**<u>DECLARATION OF PROFESSOR JOHN QUACKENBUSH, PH.D.</u>**

# **TABLE OF CONTENTS**

**Page**

I.   SUMMARY OF OPINIONS ................................................................ 1

II.  BACKGROUND AND QUALIFICATIONS ................................... 4

III. MATERIALS RELIED UPON ........................................................ 8

IV.  FRAMEWORK FOR MY ANALYSIS ......................................... 8

    A.   *Alice/Mayo* Framework ....................................................... 8

    B.   Priority Date ............................................................................ 9

    C.   Person Of Ordinary Skill In The Art ................................... 10

V.   BACKGROUND OF THE PATENTS ........................................... 11

    A.   The Patent Family ................................................................ 11

    B.   Stanford's Patent Claim Strategy ....................................... 12

    C.   The Patent Claims ................................................................ 14

        1.   The '652 Patent .......................................................... 14

        2.   The '497 Patent .......................................................... 16

        3.   The '607 Patent .......................................................... 17

VI.  BACKGROUND ON THE TECHNOLOGY ................................ 20

    A.   Nucleic Acids And Genes .................................................... 20

    B.   Genes, Polymorphisms, Homozygosity, And Heterozygosity .......... 21

    C.   Cell-Free Nucleic Acids ...................................................... 24

    D.   Cell-Free Nucleic Acids Having Sequences Different From A
Patient's Genotype Occur Naturally In An Individual's
Circulation ............................................................................ 26

        1.   Cell-Free Nucleic Acids In Organ Transplant ......... 26

        2.   Cell-Free Nucleic Acids In Pregnancy ..................... 27

        3.   Cell-Free Nucleic Acids In Cancer ........................... 28

        4.   Cell-Free Nucleic Acids In Infectious Disease ......... 29

        5.   Scientists Have Long Used Cell-Free Nucleic Acids To
Monitor Disease ......................................................... 30

Ai

VII. THE PATENT CLAIMS ARE DIRECTED TO WELL-
UNDERSTOOD, ROUTINE AND CONVENTIONAL
TECHNIQUES APPLIED TO OBSERVING A NATURAL
PHENOMENON ........................................................................ 31

    A. The Claims of the Patents Are Directed to a Natural Law ................ 31

    B. Each Recited Laboratory Technique Was Conventional ................... 34

        1. Obtaining Or Providing a Biological Sample Containing
Cell-Free Nucleic Acids From a Transplant Recipient ........... 39

        2. Genotyping The Transplant Donor And/Or Recipient To
Establish Profiles Of Genetic Polymorphisms (Or SNPs),
Including By Comprising Selectively Amplifying At
Least 1,000 SNPs By PCR And Sequencing .......................... 41

            (a) PCR, Including Selective Amplification, Was a
Well-Understood, Routine and Conventional
Method For Genotyping By 2009 ................................ 43

            (b) Arrays Were a Well-Understood, Routine and
Conventional Method For Genotyping By 2009 .......... 46

            (c) Sequencing Was a Well-Understood, Routine and
Conventional Method For Genotyping By 2009 .......... 49

            (d) The Patents Claim No Improvements To Or
Nonconventional Uses Of The Conventional
Genotyping Methods Available In 2009 ...................... 51

        3. Performing Multiplex Or High-Throughput Sequencing
Of (Or Digital PCR On) The cfDNA To Detect The
Genotyped Polymorphisms (Or SNPs) ................................... 52

            (a) Background On Multiplex / High Throughput
Sequencing Technology ............................................... 53

            (b) Commercially Available Multiplex And High-
Throughput Sequencing Platforms As Of 2009 ........... 55

            (c) Sensitivities And Error Rates Inherent In The
Available Sequencing Instruments ............................... 62

            (d) Digital PCR Methods Were Routine And
Commercially Available In 2009 ................................. 68

            (e) The Patents Claim No Improvements To Or
Nonconventional Uses Of The Conventional

Aii

Multiplex/High-Throughput Sequencing Or dPCR
Methods Available In 2009 .............................................. 68

4.   Quantifying The Transplant cfDNA In The Sample,
Using The Polymorphisms / SNPs In The Sequences ............ 69

C.   The Claimed Combinations Of Steps For Detecting Multiple
Genomes In A cfDNA Sample Were Conventional .......................... 72

1.   The Patents' Written Description States That The
Laboratory Techniques In The Claims As A Whole Were
Conventional As Of 2009 ....................................... 72

2.   POSAs Have Long Recognized That The Same Methods
For Detecting Fetal, Cancer, And Infectious cfDNA
Could Be Used To Detect Transplant cfDNA ........................ 76

3.   POSAs Had Already Established The Claimed
Laboratory Techniques By 2009 To Detect Multiple
Genotypes In A Sample, Including In The Transplant
Setting ....................................................... 82

(a)   Cantor et al. – 2007 .................................... 82

(b)   Lo et al. – 2009 ........................................ 85

(c)   Dhallan et al. – 2007 ................................... 88

(d)   Beck et al. – 2009 ...................................... 91

(e)   Beck et al. – 2010 ...................................... 94

(f)   Gordon et al. – 2009 .................................... 96

(g)   Holt et al. – 2009 ...................................... 98

D.   The Dependent Claims Also Recite Well-Understood, Routine
and Conventional Steps .................................................. 100

1.   Dependent Claims Reciting Different Types Or Numbers
Of Polymorphisms ............................................. 101

2.   Dependent Claims Reciting Different Types Of cfDNA ....... 103

3.   Dependent Claims Reciting Certain Common
Modifications, Error Rates, Or Quality Scores Associated
With Multiplexed Or High Throughput Sequencing ............. 104

4.   Dependent Claims Reciting Organ or Species Limitations ... 108

Aiii

     5.      Dependent Claims Reciting Conventional PCR Or
Amplification Methods ......................................................... 108

     6.      Dependent Claims Reciting Different Sample Types ............ 109

     7.      Dependent Claims Reciting Further Genotyping Prior To
Quantifying Cell-Free Nucleic Acids ................................... 110

     8.      Dependent Claims Reciting Certain Concentrations Of
Cell-Free Nucleic Acids In The Sample ............................... 110

  E.    Concluding Opinions Regarding Conventionality of the Recited
Combination of Laboratory Techniques........................................... 111

VIII.  THE PATENT METHODS DO NOT CREATE ANY NEW
PREPARATION...................................................................................... 112

Aiv

Reply.Add6

# I.  SUMMARY OF OPINIONS

1.  In my opinion, the methods claimed in U.S. Patent Nos. 8,703,652 (the "'652 Patent), 9,845,497 (the "'497 Patent"), and 10,329,607 (the "'607 Patent", and collectively the "Patents") were, as of at least November 6, 2009, well-understood, routine, and conventional approaches to detecting a natural phenomenon regarding foreign genetic material (here, quantities of organ donor-derived cell-free nucleic acids) in a patient's body (here, an organ transplant recipient's circulation). In the case of the '652 Patent, the claims further recite routine and conventional approaches to correlating increasing amounts of that foreign genetic material over time to a disease (here, transplant rejection or failure).

2.  As recited in the Patent claims, and as confirmed by the Patents' common written description, the presence and amount of foreign cell-free nucleic acids in a patient's body are a natural phenomenon. They are a natural consequence of biological processes, *i.e.*, death of the cells in the transplanted organ, and release of the cells' contents into the recipient's body. The correlation of amounts of those foreign cell-free nucleic acids to disease also is a natural phenomenon, *i.e.*, it is an observation that the more the transplanted organ is rejected or fails, the more of its cells die, and the more its cells' contents are released into the transplant recipient's body. These phenomena are not something the Patent inventors created; they are the result of biological processes occurring in a transplant recipient's body.

A1

3. As recited in the Patents' written description, as well as established by the references discussed below, the correlation between circulating nucleic acids that differ from a patient's normal genotype and solid organ transplant rejection has been known since prior to at least November 6, 2009. B0001-B0024 ('652 Patent) at B0012-B0013, 6:56-8:21. For example, citing publications from 2006 and 2007, the Patents' written description shows it had already been established that "for heart transplant patients, donor-derived DNA present in plasma can serve as a potential marker for the onset of organ failure." *Id.* at B0013, 8:18-21.

4. The methods of the Patent claims are directed solely to detecting these natural phenomena using well-understood, routine and conventional procedures known to a person of skill in the art ("POSA") as of at least November 6, 2009. This is confirmed by the Patents' shared written description, which states "[t]he practice of the present invention employs, unless otherwise indicated, conventional techniques of immunology, biochemistry, chemistry, molecular biology, microbiology, cell biology, genomics and recombinant DNA, which are within the skill of the art." B0001-B0024 ('652 Patent) at B0012, 5:36-40. Regarding the language, "unless otherwise indicated," neither the written description nor the claims identify any nonconventional techniques for use in the claims, nor anything nonconventional about the way the techniques are used together in the claims. The claimed laboratory techniques were already, by November 6, 2009, standard means

A2

for detecting foreign or abnormal cell-free nucleic acids in other contexts, including naturally occurring fetal DNA in the blood of a pregnant woman, naturally occurring mutated tumor DNA in the blood of a cancer patient, and naturally occurring bacterial or viral DNA in the blood of a sick person. *E.g.*, B0001-B0024 ('652 Patent) at B0012-B0013, 6:56-7:36.[1] Moreover, the Patents and prior and contemporaneous literature acknowledge that the same techniques used to quantify foreign nucleic acids in the fetal, cancer, and infectious disease contexts applied equally to the quantification of foreign nucleic acids in the transplant context.

5.      Furthermore, it is my opinion that the claims here are not directed to the creation of any new or unnatural preparation. Rather, the techniques described in the Patent claims begin with obtaining from a patient a sample that already contains naturally occurring cell-free nucleic acids, and end with an observation of those same naturally occurring cell-free nucleic acids (including as being a marker for organ transplant rejection).

6.      It is my opinion that as of November 6, 2009, the Patents offered no improvements upon, or nonconventional ways of using, the laboratory techniques

---

[1] *See id.* at 7:30-36 ("In all these applications of circulating nucleic acids [referring to publications no later than 2008], the presence of sequences differing from a patient's normal genotype has been used to detect disease. In cancer, mutations of genes are a tell-tale sign of the advance of the disease; in fetal diagnostics, the detection of sequences specific to the fetus compared to maternal DNA allows for analysis of the health of the fetus.").

A3

recited in the claims. These techniques were well known in the art and standard for detecting and quantifying foreign cell-free nucleic acids in a patient's blood by at least November 6, 2009, when the Patents were filed. I base these opinions on the statements in the Patents' specification (written description and claims) describing all of these techniques as conventional, as well as my own experience and the literature analyzed below.

## II.    BACKGROUND AND QUALIFICATIONS

7.    I am the Henry Pickering Walcott Professor of Computational Biology and Bioinformatics and Chair of the Department of Biostatistics at the Harvard T.H. Chan School of Public Health. In addition, I direct the MS program in Computational Biology and Quantitative Genetics, the Big Data to Knowledge Ph.D. training grant, and am a co-director for our Cancer Ph.D. Training renewal application. I am also a Professor of Biostatistics and Computational Biology and Cancer Biology at the Dana-Farber Cancer Institute. Until recently, I also served as the Director of the Center for Cancer Computational Biology at Dana-Farber, which performed large-scale data analyses in support of research studies, including many that involved circulating DNA. I now direct the Quantitative Biomedical Research Center at the Harvard Chan School, which performs similar work in support of research.

8.    As discussed in more detail below, prior to November 6, 2009, I had significant experience using the standard techniques and standard combinations of

A4

techniques recited in the Patent claims. For example, prior to November 6, 2009, I used standard PCR techniques for genotyping, including by selective amplification of SNPs, in large-scale projects analyzing cancer from diverse biological samples including cell lines, human tissue samples, circulating tumor cells, and circulating cell-free DNA. In all of these projects, I used standard and routine PCR applications for genotyping, including for genotyping involving selective amplification of SNPs. I also have significant personal experience using arrays for genotyping, including SNP genotyping. I also have significant personal experience using what as of November 6, 2009 were conventional multiplex or high-throughput sequencing instruments for genotyping and quantifying SNPs, including in cell-free nucleic acids. I personally used routine and conventional techniques to carry out the combinations of methods recited in the Patents as of November 6, 2009.

9.      In addition to my academic appointments and research responsibilities, I serve on the Editorial Board of Cancer Research, the flagship scientific journal of the American Association for Cancer Research. I also serve on the Editorial Boards of BMC Genomics and Biotechniques, and was previously the Editor-in-Chief at Genomics. Over the years, I have also taken on significant regional and national research leadership responsibilities. I served on the Scientific Advisory Board of the St. Jude's Children's Research Hospital, the Lovelace Respiratory Research Institute, the National Institute of Health's TOPMED program, and the Board of

A5

Scientific Counselors of the Environmental Protection Agency. I am currently on the Scientific Advisory Board at Shriner's Hospitals for Children and advise Merck KGaA on precision medicine and immunotherapy. I have served on numerous scientific review panels for the National Institutes of Health, the National Cancer Institute, the National Research Council, the National Science Foundation, the Wellcome Trust, Genome British Columbia, Genome Canada, the European Union, and the National Academy of Sciences.

10.    I am a co-founder of Genospace LLC. Genospace produces software solutions to operationalize precision medicine through the integration of clinical and genomic data and its presentation to clinical and research users in an intuitive format.

11.    I have presented more than 300 talks, courses, and workshops since joining Dana-Farber and the Harvard School of Public Health in 2005. I have also taught numerous courses and workshops on the analysis of genomic data. I have particular expertise in molecular biology techniques and gene expression, including DNA sequencing, gene expression analysis, methylation analysis, the mapping of transcription factor binding sites, and the development of methods for data analysis and interpretation in computational and systems biology.

12.    Prior to joining the faculty at Dana-Farber and Harvard, I was a Professor of Chemical Engineering at the University of Maryland from 2003-2005; an Investigator with The Institute for Genomic Research from 2002-2006; a

A6

Professor in the Department of Biochemistry at The George Washington University from 2000-2005; a Lecturer in The Department of Biostatistics at Johns Hopkins University from 1998-2005; an Associate Investigator at The Institute for Genomic Research from 1997-2001; and an Assistant Investigator at The Institute for Genomic Research in 1997.

13.    I received my Ph.D. in Theoretical Particle Physics at the University of California, Los Angeles in 1990. I also hold a Master of Science degree in Physics from the University of California, Los Angeles and a Bachelor of Science degree in Physics from the California Institute of Technology.

14.    In addition to the NCI Outstanding Investigator Award, I have received numerous additional awards and honors, including being recognized as a White House Open Science Champion of Change, an Australia Fellow, and a Distinguished International Advisor for the International Conference of BioInformatics and BioEngineering sponsored by the Institute of Electrical and Electronics Engineers.

15.    I have studied, taught, practiced, and conducted research in genomics and computational analysis of data related to genomic technologies. I have expertise in genomic technologies, computational analysis, and modeling of systems related to human diseases and genetic mutations. I have more than 25 years of continuous grant support from the National Institutes of Health, including extensive support from the National Cancer Institute. In 2018, I was awarded an NCI Outstanding

A7

Investigator Award, which is a research grant "Career Award" that provides long-term research funding support and increased flexibility for investigators with outstanding records of research productivity, allowing them to continue or embark upon a research program of unusual potential in cancer. I have published 301 peer-reviewed scientific papers, more than half of which directly involve some aspect of cancer research, and nearly all of which are relevant to understanding what drives the development and progression of the disease. My articles have been cited over 75,000 times.

16.     My curriculum vitae is attached to this declaration as Exhibit 1.

## III.   MATERIALS RELIED UPON

17.     I have based my opinions reflected in this declaration on my education and professional experience, my review of the Patents and file histories, my review of the literature and other patents, and my review of product information as reflected in this declaration and also in Exhibit 2 to this declaration.

## IV.   FRAMEWORK FOR MY ANALYSIS

### A.     *Alice/Mayo* Framework

18.     I am not a lawyer, but it is my understanding that the Supreme Court has held that laws of nature, natural phenomena, and abstract ideas are not patentable under the Patent Act, 35 U.S.C. § 101 ("Section 101"). It is my understanding that a two-step analysis is used to determine what is and what is not patent eligible. First, a court must decide whether the claims at issue are directed to one of the three patent-

A8

ineligible concepts: abstract ideas, natural laws, or natural phenomena. If so, then the court must analyze whether the claims provide an inventive concept.

19.     It is my understanding that a method reciting a law of nature or natural phenomena is not patentable where the steps involve well-understood, routine, conventional activity previously engaged in by researchers in the field. It is further my understanding that appending routine, conventional steps to a natural phenomenon, specified at a high level of generality, is not enough to supply an inventive concept for purposes of making claims patentable under Section 101.

20.     I further understand that a court may analyze claims as "representative" of other claims for purposes of determining patent eligibility. I understand that a claim is representative of other claims if the claims are substantially similar and linked to the same patent-ineligible concept (*e.g.*, the same natural phenomenon).

21.     I have applied these standards in my analysis of the claims of the Patents.

### B.     Priority Date

22.     I assume, for purposes of this analysis only, that the Stanford Patents are entitled to the benefit of the November 6, 2009 date of the earliest-filed provisional application, U.S. Patent Application No. 61/280,674, to which the patents claim priority. I have not analyzed whether the Patents are entitled to the date of the earliest filed provisional application to which they claim priority. My

A9

conclusions would be the same, however, if I used any of the dates of the later-filed applications to which the Patents claim priority.

### C. Person Of Ordinary Skill In The Art

23.     I am informed that for purposes of a Section 101 patent eligibility, claims are analyzed from the perspective of a person of ordinary skill in the art ("POSA") at the time of the priority date of the patent. I am further informed that a POSA is a hypothetical person to whom one could assign a routine task in the relevant field with reasonable confidence that the task would be successfully carried out. I have been asked to assume that the relevant timeframe for the Patents is prior to November 6, 2009, which I am assuming, for purposes of this analysis, is the priority date.

24.     In my opinion, a POSA, for the Patents, at or prior to November 6, 2009, would have at least a bachelor's degree (with several additional years of laboratory experience) in a life or physical sciences discipline with applications in genomics. Through further education or graduate or postdoctoral experience, such a person would have obtained a thorough understanding of nucleic acid detection, quantification, and genotyping, and would have understood the basic underlying scientific principles of nucleic acid assay and detection and genotyping techniques. A POSA would also have general knowledge of, and be able to read literature on, nucleic acid assay methods including, for example, amplification by polymerase

A10

chain reaction ("PCR"), nucleic acid sequencing including by multiplex or high-throughput sequencing, genotyping, and the detection and quantification of nucleic acids using, e.g., polymorphism-based genotyping. *See* Section VII.B. below for exemplary prior art relating to these laboratory techniques. In determining the level of ordinary skill in the art, more education could compensate for less experience, and vice versa.

25.     Moreover, a POSA would have an understanding of methods for detecting and quantifying cell-free DNA ("cfDNA"), including cfDNA that is foreign to or abnormal in a sample, in various contexts including fetal cfDNA in samples from pregnant women, tumor cfDNA in samples from cancer patients, pathogen cfDNA in samples from infectious disease patients, and transplant cfDNA in organ transplant recipients, among others. In determining the level of ordinary skill in the art, more education could compensate for less experience, and vice versa.

26.     On and prior to November 6, 2009, I would have been at least a person of ordinary skill in the art as it pertains to the Patents.

## V.     BACKGROUND OF THE PATENTS

### A.     The Patent Family

27.     I understand that the Patents are members of the same patent family. They all claim priority to the same November 6, 2009 provisional patent application,

A11

U.S. Patent Application Number 61/280,674, and they share the same written description.

28.     The Patent claims are likewise directed to similar methods. Claim 1 of the '652 Patent recites "[a] method for ***detecting transplant rejection … or organ failure***" by "***determining a quantity of [] donor cell-free nucleic acids based on the detection of the donor cell-free nucleic acids***…." Claim 1 of the '497 Patent recites "[a] method of ***detecting donor-specific circulating cell-free nucleic acids in a solid organ transplant recipient***." And claim 1 of the '607 Patent recites "[a] method of ***quantifying kidney transplant-derived circulating [cfDNA] in a human kidney transplant recipient***."

**B.      Stanford's Patent Claim Strategy**

29.     As I will explain in more detail below, the claims all recite using the same general combination of techniques for the recited detection of quantities of cell-free donor nucleic acids in a transplant recipient's body, and its correlation to transplant status. The claimed methods are a combination of four steps, recited at a high level, as follows:

> **a.      Obtaining/providing a biological sample containing cfDNA from a transplant recipient**
>
> ▪ *See* '652 Patent Claim 1(a) ("providing a sample comprising [cfDNA]")

A12

▪ *See* '497 Patent Claim 1(c) ("obtaining a biological sample")[2]

▪ *See* '607 Patent Claims 1(a) and (b) ("providing a plasma sample" and "extracting circulating [cfDNA]")

**b.   Genotyping the transplant donor and/or recipient to establish profiles of genetic polymorphisms (or SNPs or distinguishable markers)**

● *See* '652 Patent Claim 1(b) ("obtaining a genotype … to establish a polymorphism profile")[3]

● *See* '497 Patent Claims 1(a) and (b) ("genotyping … to obtain a SNP profile")[4]

● *See* '607 Patent Claim 1(c) ("performing a selective amplification of [SNPs] … by [PCR]"); Claim 1(f) ("using markers distinguishable between said [recipient and donor] [that] comprise [SNPs]")[5]

**c.   Performing multiplex or high-throughput sequencing of the cfDNA to detect the genotyped polymorphisms (or SNPs)**

● *See* '652 Patent Claim 1(c) ("multiplex sequencing of the [cfDNA] in the sample followed by analysis of the sequencing results using the polymorphism profile")[6]

● *See* '497 Patent Claim 1(d) ("determining an amount of donor-specific [cfDNA] by … high-throughput sequencing or

---

[2] Dependent '497 patent claims 2, 9, 12, and 27 recite similar sampling and transplant-related limitations.

[3] Dependent '652 patent claims 2 and 11 recite similar genotyping and polymorphism-related limitations.

[4] Dependent '497 patent claims 6, 15, 17, and 25 recite similar genotyping and polymorphism-related limitations.

[5] Dependent '607 patent claims 2-5 recite similar genotyping and polymorphism-related limitations.

[6] Dependent '652 patent claim 6 recites similar sequencing-related limitations.

A13

[dPCR]")[7]

- *See* '607 Patent Claims 1(d-e) ("performing a high throughput sequencing reaction … compris[ing] … sequencing-by-synthesis … [and] … providing sequences from said high throughput sequencing reaction")

### d. Quantifying the transplant cfDNA in the sample using the genetic differences in the sequences

- *See* '652 Patent Claim 1(d) ("determining a quantity of [transplant cfDNA] based on the detection of [donor and recipient cfDNA] by the multiplexed sequencing")

- *See* '497 Patent Claim 1(d) ("determining an amount of [transplant cfDNA] … by detecting a homozygous or a heterozygous SNP within the [transplant cfDNA]")

- *See* '607 Patent Claim 1(f) ("quantifying an amount of [transplant cfDNA] … using markers distinguishable between … recipient and … donor"

## C. The Patent Claims[8]

### 1. The '652 Patent

30. The '652 Patent has 16 claims. They include one independent claim (Claim 1) and 15 dependent claims (Claims 2-16). I understand that each of

---

[7] Dependent '497 patent claims 3-5, and 10 recite similar sequencing-related limitations.

[8] I understand that the asserted claims in this action against Natera and/or Eurofins include the following: '652 Patent claims 1-4, 6, 11-12, and 14-15; '497 Patent claims 1-6, 9-10, 12, 15, 17, 19-21, 23, 25, and 27; and '607 Patent claims 1-10. For purposes of this analysis, I opine only on these asserted patent claims. I do not offer opinions on the unasserted dependent claims of any of the Patents.

A14

dependent claims 2-16 incorporate by reference the requirements of claim 1 and add

further limitations as recited in each dependent claim, respectively.

    31.    Representative claim 1 of the '652 Patent recites (emphasis added):

1. A method for detecting transplant rejection, graft dysfunction, or organ failure, the method comprising:

    (a) ***providing a sample comprising cell-free nucleic acids*** from a subject who has received a transplant from a donor;

    (b) ***obtaining a genotype*** of donor-specific polymorphisms or a genotype of subject-specific polymorphisms, or obtaining both a genotype of donor-specific polymorphisms and subject-specific polymorphisms, ***to establish a polymorphism profile*** for detecting donor cell-free nucleic acids, wherein ***at least one single nucleotide polymorphism (SNP) is homozygous*** for the subject if the genotype comprises subject-specific polymorphisms comprising SNPs;

    (c) ***multiplex sequencing*** of the cell-free nucleic acids in the sample followed by analysis of the sequencing results using the polymorphism profile to detect donor cell-free nucleic acids and subject cell-free nucleic acids; and

    (d) ***diagnosing, predicting, or monitoring a transplant status*** or outcome of the subject who has received the transplant ***by determining a quantity of the donor cell-free nucleic acids*** based on the detection of the donor cell-free nucleic acids and subject cell-free nucleic acids by the multiplexed sequencing, ***wherein an increase in the quantity of the donor cell-free nucleic acids over time is indicative of transplant rejection, graft dysfunction or organ failure***, and wherein sensitivity of the method is greater than 56% compared to sensitivity of current surveillance methods for cardiac allograft vasculopathy (CAV).

    32.    The dependent claims of the '652 Patent are substantially similar to

claim 1, and are all linked to the same natural phenomenon of donor-derived cell-

free nucleic acids in a transplant recipient's body, as well as the same natural
phenomenon of genetic polymorphisms in those cell-free nucleic acids. These
dependent claims are discussed in more detail in section VII.A. below.

### 2. The '497 Patent

33. The '497 Patent has 33 claims. They include one independent claim
(Claim 1) and 32 dependent claims (Claims 2-32). I understand that each of
dependent claims 2-32 incorporate by reference the requirements of claim 1, or
depend from other claims that incorporate by reference the requirements of claim 1,
and add further limitations as recited in each dependent claim, respectively.

34. Representative claim 1 of the '497 Patent recites (emphasis added):

1. A method of detecting donor-specific circulating cell-free nucleic
acids in a solid organ transplant recipient, the method comprising:

(a) *genotyping* a solid organ transplant donor *to obtain a single
nucleotide polymorphism (SNP) profile* of the solid organ
transplant donor;

(b) *genotyping* a solid organ transplant recipient *to obtain a SNP
profile* of the solid organ transplant recipient, wherein the solid
organ transplant recipient is selected from the group consisting of: a
kidney transplant, a heart transplant, a liver transplant, a pancreas
transplant, a lung transplant, a skin transplant, and any combination
thereof;

(c) *obtaining a biological sample* from the solid organ transplant
recipient after the solid organ transplant recipient has received the
solid organ transplant from the solid organ transplant donor, wherein
the biological sample is selected from the group consisting of blood,
serum and plasma, and *wherein the biological sample comprises*

A16

*circulating cell-free nucleic acids from the solid organ transplant*;
and

(d) **determining an amount of donor-specific circulating cell-free
nucleic acids** from the solid organ transplant in the biological
sample by **detecting a homozygous or a heterozygous SNP** within
the donor-specific circulating cell-free nucleic acids from the solid
organ transplant in at least one assay, wherein the at least one assay
comprises **high-throughput sequencing or digital polymerase
chain reaction (dPCR)**, and wherein the at least one assay detects
the donor-specific circulating cell-free nucleic acids from the solid
organ transplant when the donor-specific circulating cell-free
nucleic acids make up at least 0.03% of the total circulating cell-free
nucleic acids in the biological sample.

35.     The dependent claims of the '497 Patent are substantially similar to
claim 1, and are all linked to the same natural phenomenon of donor-derived cell-
free nucleic acids in a transplant recipient's body as well as the same natural
phenomenon of genetic polymorphisms in those cell-free nucleic acids. These
dependent claims are discussed in more detail in section VII.A. below.

### 3.     The '607 Patent

36.     The '607 Patent has 10 claims. They include one independent claim
(Claim 1) and nine dependent claims (Claims 2-10). I understand that each of
dependent claims 2-10 incorporate by reference the requirements of claim 1 (or
depend from other claims that incorporate by reference the requirements of claim 1),
and add further limitations as recited in each dependent claim, respectively.

37.     Representative claim 1 of the '607 Patent recites (emphasis added):

A17

1. A method of quantifying kidney transplant-derived circulating cell-free deoxyribonucleic acids in a human kidney transplant recipient, said method comprising:

(a) ***providing a plasma sample*** from said human kidney transplant recipient, wherein said human kidney transplant recipient has received a kidney transplant from a kidney transplant donor, wherein said plasma sample from said human kidney transplant recipient ***comprises kidney transplant-derived circulating cell-free deoxyribonucleic acid and human kidney transplant recipient-derived circulating cell-free deoxyribonucleic acid***;

(b) ***extracting circulating cell-free deoxyribonucleic acid from said plasma sample*** from said human kidney transplant recipient in order to obtain extracted circulating cell-free deoxyribonucleic acid, wherein said extracted circulating cell-free deoxyribonucleic acid comprises said kidney transplant-derived circulating cell-free deoxyribonucleic acid and human kidney transplant recipient-derived circulating cell-free deoxyribonucleic acid;

(c) ***performing a selective amplification of target deoxyribonucleic acid sequences***, wherein said selective amplification of said target deoxyribonucleic acid sequences is of said extracted circulating cell-free deoxyribonucleic acid, wherein said selective amplification of said target deoxyribonucleic acid sequences amplifies a plurality of genomic regions ***comprising at least 1,000 single nucleotide polymorphisms***, wherein said at least 1,000 single nucleotide polymorphisms comprise ***homozygous*** single nucleotide polymorphisms, ***heterozygous*** single nucleotide polymorphisms, or both homozygous single nucleotide polymorphisms and heterozygous single nucleotide polymorphisms, and wherein said selective amplification of said target deoxyribonucleic acid sequences is ***by polymerase chain reaction (PCR)***;

(d) ***performing a high throughput sequencing reaction***, wherein said high throughput sequencing reaction comprises performing a ***sequencing-by-synthesis*** reaction on said selectively-amplified target deoxyribonucleic acid sequences from said extracted circulating cell-free deoxyribonucleic acid, wherein said

A18

sequencing-by-synthesis reaction has a sequencing error rate of less than 1.5%;

(e) *providing sequences from said high throughput sequencing reaction*, wherein said provided sequences from said high throughput sequencing reaction comprise said at least 1,000 *single nucleotide polymorphisms*; and

(f) *quantifying an amount of said kidney transplant-derived circulating cell-free deoxyribonucleic acid* in said plasma sample from said human kidney transplant recipient to obtain a quantified amount, wherein said quantifying said amount of said kidney transplant-derived circulating cell-free deoxyribonucleic acid in said plasma sample from said human kidney transplant recipient comprises *using markers distinguishable between said human kidney transplant recipient and said kidney transplant donor*, wherein said markers distinguishable between said human kidney transplant recipient and said kidney transplant donor *comprises single nucleotide polymorphisms* selected from said at least 1,000 single nucleotide polymorphisms identified in said provided sequences from said high throughput sequencing reaction, and wherein said quantified amount of said kidney transplant-derived circulating cell-free deoxyribonucleic acid in said plasma sample from said human kidney transplant recipient comprises at least 0.03% of the total circulating cell-free deoxyribonucleic acid from said plasma sample from said human kidney transplant recipient.

38. The dependent claims of the '607 Patent are substantially similar to claim 1, and are all linked to the same natural phenomenon of donor-derived cfDNA in a transplant recipient's body as well as the same natural phenomena of SNPs in the cf DNA. These dependent claims are discussed in more detail in section VII.A. below.

A19

## VI.   BACKGROUND ON THE TECHNOLOGY

### A.   Nucleic Acids And Genes

39.   Nucleic acids are biomolecules that are present in all living things. They store and encode the information living cells need to grow and function. Although there are many different subtypes of nucleic acids, naturally occurring, biologically active nucleic acids fall into two main classes: deoxyribonucleic acid ("DNA") and ribonucleic acid ("RNA").

40.   DNA naturally exists as two long strands in a double-helical structure. Each strand is comprised of a sequence of "nucleotides" connected at regular intervals along the strand. On each nucleotide is one of several different types of "bases." There are four natural types of bases that occur in DNA: adenine ("A"), cytosine ("C"), guanine ("G") and thymine ("T"), which pair together complementarily (A to T, and C to G) to hold the two strands of DNA together. Each base, with its corresponding piece of the backbone of the DNA strand, is referred to as a "nucleotide."

41.   An individual's DNA is organized into chromosomes, which reside in the nucleus of eukaryotic cells. This, and the general structure of DNA, is depicted in the figure below:



## B.    Genes, Polymorphisms, Homozygosity, And Heterozygosity

42.    It is the unique sequence of bases in DNA that creates a code, or blueprint, for the production of other molecules such as proteins, which form cells' structures and make them function.

43.    All individuals (apart from identical twins) have unique DNA sequences that genetically distinguish one person from another. The genetic constitution of an individual is called a "genotype." The differences in genetic sequences that give rise to everyone's unique genotype are called "polymorphisms." A "single nucleotide polymorphism," or "SNP," occurs where the nucleotide at a specific location may differ between different individuals. SNPs occur at about one

A21

base out of 1,000 and there are about 3,000,000 differences between any two individuals. Such variations can be used to distinguish one individual from another. An example of a SNP is depicted in the figure below:



44.    Humans have two copies of each of their chromosomes – one inherited from the mother, and the other from the father. Zygosity describes the similarities or differences in polymorphisms between the maternally inherited and paternally inherited copies. An organism is "homozygous" for a particular gene or polymorphism if its maternally inherited and paternally inherited copies have the same sequence. An organism is "heterozygous" for a particular gene or polymorphism if it has different sequences on its maternally inherited and paternally inherited copies, respectively. An example of a homozygous and heterozygous SNPs, reproduced from Figure 1 of B0074-B0079 (Nordstrom 2000) at B0075, is shown below (red boxes and "homozygous" and "heterozygous" labels added):

A22



46.    There is on average one SNP in every ~1,000 nucleotides in humans, and two individuals on average vary in approximately ~3,000,000 SNPs. B0001-B0024 ('652 Patent) at B0016, 13:41-44; B0481-B0580, (Vogel 2009) at B0574.  Given the diversity in SNPs among individuals, scientists have exploited SNPs for many different purposes, including identifying people in forensic analyses, or determining patterns of SNPs associated with specific populations or disease states.

46.    In addition to SNPs, there are other types of genetic variations. For example, "VNTRs," or variable numbers of tandem repeats, are short sequence repeats that are polymorphic due to variable numbers of short sequence repeat units as between individuals. While "dinucleotide repeats" are most common VNTRs can also be tri-, tetra-, or penta-repeats (often called microsatellites). VNTRs with longer repeat units of 15-500 nucleotides are called "minisatellites." "Insertion" and "deletion" polymorphisms are due to the presence of additional sequences or

A23

absence of normally present sequences, respectively. Regions of DNA that have many of the polymorphisms described above are commonly known as "hypervariable regions."

### C. Cell-Free Nucleic Acids

47.     As discussed above, human DNA is most commonly found in the nuclei of cells in chromosomes. But DNA also can naturally exist outside of the cell. What scientists typically refer to as "cell-free" nucleic acids (and in the case of DNA, cell-free DNA or "cfDNA") are small fragments of nucleic acids that are released from cells into the bloodstream. They circulate freely in the blood and other bodily fluids. These cell-free nucleic acids are usually produced when cells die, in a process called "apoptosis." In apoptosis, cells undergo various biochemical processes that cause the nucleic acids, including DNA of the cells' chromosomes, to be cleaved and fragmented before being released into the circulation. They are eventually cleared out of the body with other bodily waste products. The process of release of cfDNA from apoptotic cells is illustrated below:

A24



48.    Because cells are constantly dying and being replaced throughout the body, cell-free nucleic acids, including cfDNA, are constantly released into and circulating through the bloodstream or other body fluids, such as urine, before being cleared out of the body, as depicted below:



A25

**D.** **Cell-Free Nucleic Acids Having Sequences Different From A Patient's Genotype Occur Naturally In An Individual's Circulation**

49.     In certain diseases and conditions, nucleic acids including cfDNA that are foreign or abnormal to a person are present in the person's body. This occurs in a variety of contexts where a source of foreign DNA, or cells with different genotypes, reside in the host. Some of these are discussed below.

**1.     Cell-Free Nucleic Acids In Organ Transplant**

50.     For example, a transplanted organ can be a source of a genotype that is different from that of the transplant recipient. If an organ from a donor is transplanted into the body of a recipient, then the donor's DNA, with its unique genotype, is also transplanted into the body of the recipient. Because a transplanted organ's cells naturally die at a certain rate, just like all of the cells in the rest of a recipient's body, cell-free nucleic acids from the donated transplant organ will be released into, and circulate in, the recipient's blood along with the cell-free nucleic acids released from the cells in all of the rest of the recipient's body. This gives rise to two different genotypes being present in the same individual recipient's blood.

51.     While many transplanted organs remain healthy, sometimes the body of the transplant recipient will reject the transplanted organ, or the transplanted organ will fail to survive for some other reason in the transplant recipient's body. Where

A26

rejection occurs, the recipient's immune system attacks the transplanted organ and
kills its cells, causing the cells to die more rapidly than they normally would. In
transplant failure for other reasons, the cells of the transplanted organ die more
rapidly than normal for a variety of reasons. Whether the transplant is rejected or
otherwise fails, the transplanted organ's cells release more cell-free nucleic acids
into the recipient's circulation than would be expected from a healthy transplant.
These elevated levels of cell-free nucleic acids originating from the donor organ is
the natural result of biological processes occurring in the transplant recipient's body.
As of the priority date, it was well known that donor-derived DNA is present in a
transplant recipient. *See, e.g.*, B0001-B0024 ('652 Patent) at B0013, 7:53-8:22;
B0080-B0081  (Lo 1998) at B0080.

## 2.    Cell-Free Nucleic Acids In Pregnancy

52.    Another example occurs in the case of pregnancy, as the fetus growing
in the body of its mother has a genotype that is different from its mother. As of the
priority date, it was well-known that fetal DNA is naturally found as cfDNA in the
pregnant mother's bloodstream, as the result of release from fetal cells that die while
the fetus is growing in the mother's body. *See, e.g.*, B0001-B0024 ('652 Patent) at
B0013, 7:19-23. This also gives rise to two different genotypes being present in an
individual pregnant woman's blood.

53.     Cell-free nucleic acids released from fetal cells into the mother's blood will reflect the fetus's genotype. Some fetuses have certain conditions such as disease, or an extra or missing chromosome ("aneuploidy," and for example, Down Syndrome). These are conditions of the fetus that are detectable while the fetus is in the womb through the fetal cell-free nucleic acids being released into the mother's bloodstream. For example, if the fetus is aneuploid, the fetal cfDNA from the extra or missing chromosome will be present in the mother's blood in greater or lesser quantity than would be expected if the fetus were not aneuploid. This observable difference, like the observable difference in a transplant recipient, is the natural result of biological processes occurring in the pregnant woman's body.

### 3.     Cell-Free Nucleic Acids In Cancer

54.     Yet another example occurs in the case of cancer, where a tumor with a unique genotype as a result of mutations grows in the body of a cancer patient. The sequences of the DNA in the tumor cells differ from those of the cells in the rest of the cancer patient, which do not have the mutations unique to the tumor. Because these tumor cells die and release their cell-free nucleic acids into the cancer patient, where they circulate together with the cell-free nucleic acids released from the non-cancerous cells in the body, the tumor acts as a source of an additional, different genotype present in the cancer patient. As of the priority date, it was well known that

A28

the DNA sequences of tumor cells differ from the DNA of a cancer patient. *See, e.g.*, B0001-B0024 ('652 Patent) at B0012, 6:67-7:5.

55. Cancer cell-free nucleic acids can serve as a source for monitoring cancer as well. The cancerous tumor cells have genetic mutations not present in the patient's normal cells, and as the tumor cells die (either because the patient's immune system attacks and kills them or they are starved for resources due to the expanding tumor mass) they release cell-free nucleic acids into the cancer patient's circulation. As a result, these genetically unique tumor cells release cell-free nucleic acids with genomes that are not normally present in the cancer patient's circulation. This phenomenon becomes more pronounced as tumors grow, and again, is the natural result of biological processes occurring in the cancer patient's body.

### 4. Cell-Free Nucleic Acids In Infectious Disease

56. In the case of infectious disease, bacteria or viruses invading a person's body have genotypes that are different than that of the person they are infecting. The bacteria or viruses are destroyed by the person's immune system, causing the release of bacterial or viral cell-free nucleic acids into the person's blood. Those bacterial or viral cell-free nucleic acids will have sequences that differ from those of the infected person, such that they act as a source of additional, different genotypes present in the infected person's body. As of the priority date, this, too, was well-known and understood by POSAs. *See* section VII.C.2. below.

A29

### 5. Scientists Have Long Used Cell-Free Nucleic Acids To Monitor Disease

57. In each of the above-referenced settings (transplant, pregnancy, cancer, and infectious disease), cells from the source of foreign DNA naturally die while inside of the patient and release their nucleic acids to circulate as cell-free nucleic acids in the patient's body. The resulting presence of cell-free nucleic acids with a different genotype than the patient's normal genotype is a natural result of biological processes that occur in the transplant recipient's, mother's, or cancer or infected patient's bodies, respectively. Scientists knew of these natural phenomena long before the November 6, 2009 priority date of the Patents. As described here in my declaration, and in the Patents themselves, scientists routinely applied methods for detecting and analyzing the pertinent genetic differences in samples from patients containing different genotypes in order to study conditions relating to them.

58. The Patents acknowledge that cell-free nucleic acids, including cfDNA, can be found circulating in an individual's bodily fluids, and that these circulating cell-free nucleic acids can be correlated to diseases involving cell death, or apoptosis. As the written description explains:

> Circulating, or cell-free, DNA was first detected in human blood plasma in 1948. … Since then, its connection to disease has been established in several areas. … Studies reveal that much of the circulating nucleic acids in blood arise from necrotic or apoptotic cells … and greatly elevated levels of nucleic acids from apoptosis is observed in diseases such as cancer. …

A30

B0001-B0024 ('652 Patent) at B0012, 6:57-67 (citations omitted); *see also* Section VII.C.2. below.

## VII. THE PATENT CLAIMS ARE DIRECTED TO WELL-UNDERSTOOD, ROUTINE AND CONVENTIONAL TECHNIQUES APPLIED TO OBSERVING A NATURAL PHENOMENON

### A. The Claims of the Patents Are Directed to a Natural Law

59. It is my opinion that the claims of the Patents are directed to a natural law—the presence of naturally occurring donor-derived cell-free nucleic acids in the bodily fluids of transplant recipients, and the correlation of those naturally occurring cell-free nucleic acids to transplant status or rejection.

60. Claim 1 of the '652 Patent recites a "method for detecting transplant rejection, graft dysfunction, or organ failure" by "diagnosing, predicting, or monitoring a transplant status or outcome of the subject who has received the transplant by determining a quantity of the donor cell-free nucleic acids based on the detection of the donor cell free nucleic acids and subject cell-free nucleic acids by the multiplexed sequencing, wherein an increase in the quantity of the donor cell-free nucleic acids over time is indicative of transplant rejection, graft dysfunction or organ failure." Thus, claim 1 of the '652 Patent provides that *if* an increase in donor cell-free nucleic acid is detected in a bodily fluid of a transplant recipient over time, *then* organ transplant rejections can be diagnosed, predicted or monitored.

A31

61.     Claim 1 of the '497 Patent recites a "method of detecting donor-specific circulating cell-free nucleic acids in a solid organ transplant recipient" by "determining an amount of donor-specific circulating cell-free nucleic acids from the solid organ transplant in the biological sample by detecting a homozygous or a heterozygous SNP … in at least one assay … wherein the at least one assay detects the donor-specific circulating cell-free nucleic acids from the solid organ transplant." Thus, claim 1 of the '497 Patent starts with donor-specific cell-free nucleic acids that are already present in a sample, and as an end result detects them.

62.     Claim 1 of the '607 Patent recites a "method of quantifying kidney transplant-derived circulating cell-free deoxyribonucleic acids in a human kidney transplant recipient" by "quantifying an amount of said kidney transplant-derived circulating cell-free deoxyribonucleic acid in said plasma sample to obtain a quantified amount." This claim, too, starts with a certain quantity of transplant-derived cfDNA already present in a sample, and as an end result observes that quantity.

63.     This presence of naturally occurring cell-free nucleic acids in the bodily fluids of transplant recipients, and its correlation to transplant status or rejection, exists apart from any human intervention. Cell death is a natural consequence of a transplanted organ's biological response to being rejected or otherwise failing. The natural result of this biological response is an elevated level of donor-specific cell-

A32

free nucleic acids in the transplant recipient's bodily fluids. As explained in the
Patents' written description, this is a natural phenomenon that does not require any
human intervention. *See, e.g.*, B0001-B0024 ('652 Patent) at B0013, 7:40-46 (stating
that "as cell-free DNA or RNA often arises from apoptotic cells, the relative amount
of donor-specific sequences in circulating nucleic acids should provide a predictive
measure of on-coming organ failure in transplant patients for many types of solid
organ transplantation including, but not limited to, heart, lung, liver, and kidney.").

64.    The independent claims of the Patents are representative of each of the
dependent claims—all of which are directed to a natural law. Each dependent claim
relies on the method of the independent claim of each patent. In addition, all recite
substantially similar methods and all are linked to observing the same natural
phenomenon of donor-specific cell-free nucleic acids in a transplant recipient's
circulation, or its correlation to transplant rejection.

65.    Beyond the elements of the claims from which they depend, the
dependent claims of the Patents recite:

- Using different types or numbers of polymorphisms ('652 Patent
  Claims 2 and 11; '497 Patent Claims 6, 17, and 25; '607 Patent Claims
  2, 3, 4, and 5)
- Using cf-DNA ('652 Patent Claim 3; '497 Patent Claim 12)
- Using certain common modifications, error rates, or quality scores
  associated with multiplexed or high throughput sequencing ('652
  Patent Claims 4 and 6; '497 Patent Claims 3, 4, 5, 19, 21, and 23 '607
  Patent Claim 6)
- Using known PCR or amplification methods '497 Patent Claim 10)

A33

- Using different sample types ('652 Patent Claim 12; '497 Patent Claims 2 and 27)
- Further genotyping prior to quantifying cell-free nucleic acids ('497 Patent Claim 15)
- Certain concentrations of cell-free nucleic acids in the sample ('497 Patent Claim 20; '607 Patent Claims 7, 8, 9, and 10)

66.    By depending on and incorporating the phenomenon of the presence of naturally occurring donor-derived cell-free nucleic acids in the circulation of transplant recipients and the natural law correlating it to transplant rejection, without adding more, each of the dependent claims of the Patents are also directed to this natural law.

### B.    Each Recited Laboratory Technique Was Conventional

67.    In my experience as a researcher in the genomics field in the 2009 timeframe, all of the techniques recited in the Patent claims were well understood, routine and conventional as of their November 6, 2009 filing date. Indeed, the Patents' written description states: "The practice of the present invention employs, unless otherwise indicated, conventional techniques of immunology, biochemistry, chemistry, molecular biology, microbiology, cell biology, genomics and recombinant DNA, which are within the skill of the art." B0001-B0024 ('652 Patent) at B0012, 5:36-40. I have reviewed the written description, including the portions referenced herein, and I have not seen any disclosure in which the Patents "otherwise indicate[]" that any of the laboratory techniques recited in the claims, or that the particular way they are combined in the claims, is nonconventional. To the contrary,

A34

the written description repeatedly describes all of the recited techniques, and the claimed combinations of them, as conventional and routinely practiced using commercially available products.

68.    As summarized above in section V, a POSA would understand the methods of the Patents to recite four common categories of laboratory techniques that were well-established approaches to cell-free nucleic acid detection and quantification by November, 2009:

- **Obtaining / providing a biological sample** containing cell-free nucleic acids from a transplant recipient;[9]
- **Genotyping** the transplant donor and/or recipient **to establish profiles of genetic polymorphisms (or SNPs)**;[10]
- **Performing multiplex or high-throughput sequencing** of the cell-free nucleic acids to detect the genotyped polymorphisms (or SNPs);[11] and

---

[9] For independent claims, see '652 Patent Claim 1(a) ("providing a sample comprising [cfDNA]"); '497 Patent Claim 1(c) ("obtaining a biological sample"); '607 Patent Claims 1(a) and (b) ("providing a plasma sample" and "extracting circulating [cfDNA]"). For dependent claims that recite similar sampling and transplant-related limitations, see '497 Patent Claims 2, 9, 12, and 27.

[10] For independent claims, see '652 Patent Claim 1(b) ("obtaining a genotype … to establish a polymorphism profile"); '497 Patent Claims 1(a) and (b) ("genotyping … to obtain a SNP profile"); and '607 Patent Claim 1(c) ("performing a selective amplification of [SNPs] … by [PCR]") and Claim 1(f) ("using markers distinguishable between said [recipient and donor] [that] comprise [SNPs]"). For dependent claims that recite similar genotyping and polymorphism-related limitations, see '652 Patent Claims 2 and 11; '497 Patent Claims 6, 15, 17, and 25; and '607 Patent Claims 2-5 recite similar genotyping and polymorphism-related limitations.

[11] For independent claims, see '652 Patent Claim 1(c) ("multiplex sequencing of the [cfDNA] in the sample followed by analysis of the sequencing results using the

A35

- **Quantifying the transplant (donor-derived) cell-free nucleic acids in the sample using the genetic differences** in the sequences.[12]

69. The Patent claims identify the recited steps only at a high level of generalization. The written description identifies many different conventional ways each of the laboratory techniques recited in those steps, and the combinations of them, can be performed. However, the claims do not identify any particular approach to performing the steps or describe any unconventional performance of the common techniques already in use in 2009 as described in the written description.

70. As I explain in section VII.B.3. below, there was what those of us in the field have characterized as an explosion of technology driven in part by rapid advances in the sensitivity, accuracy, and throughput of DNA sequencing and analysis methods that had become routine and conventional for cell-free nucleic acid

---

polymorphism profile"); '497 Patent Claim 1(d) ("determining an amount of donor-specific [cfDNA] by … high-throughput sequencing or [dPCR]"); '607 Patent Claims 1(d-e) ("performing a high throughput sequencing reaction … compris[ing] … sequencing-by-synthesis … [and] … providing sequences from said high throughput sequencing reaction"). For dependent claims that recite similar sequencing-related limitations, see '652 Patent Claims 4 and 6; and '497 Patent Claims 3-5, and 10.

[12] For independent claims, see '652 Patent Claim 1(d) ("determining a quantity of [transplant cfDNA] based on the detection of [donor and recipient cfDNA] by the multiplexed sequencing"); '497 Patent Claim 1(d) ("determining an amount of [transplant cfDNA] … by detecting a homozygous or a heterozygous SNP within the [transplant cfDNA]"); and '607 Patent Claim 1(f) ("quantifying an amount of [transplant cfDNA] … using markers distinguishable between … recipient and … donor").

A36

detection as recited in the Patent claims in the years leading up to November 2009.
I know this from my own professional experience at the time, and it is corroborated
by the literature.

71.    For example, during the relevant 2009 time period I was a scientific
advisor for Helicos Biosciences, Inc. ("Helicos"), which was co-founded by named
Patent inventor Dr. Stephen Quake. A 10-K Annual Report for fiscal year 2007 from
Helicos explains the state of the industry at that time, and reinforces my opinion that
the laboratory techniques recited in the claims of the Patents were well understood,
routine and conventional by November 2009:

> Since the development of genetic engineering techniques in the 1970s,
> the analysis of genetic material has become a mainstay of biological
> research. The first automated DNA sequencer was invented in 1986,
> based on technology developed by Frederick Sanger and his colleagues
> in 1975, which is commonly referred to as Sanger sequencing.
> Subsequent versions of commercial DNA sequencers have increased
> the speed of DNA sequencing by 3,000 fold, making possible the
> Human Genome Project. In 1996 the first commercial microarray was
> introduced and enabled a new era of RNA analysis by measuring gene
> expression across many genes in a single experiment. Subsequent
> versions of the commercial microarrays including DNA and RNA have
> significantly increased the amount of information per run and provided
> selected SNPs of the whole human genome on a single chip, enabled
> large scale genome-wide SNP association studies and have been
> commercialized for several diagnostic applications. Today,
> manufacturers of systems, supplies and reagents for performing genetic
> analysis, which includes DNA sequencing, genotyping, and gene
> expression analysis, serve a worldwide market of approximately $5
> billion, according to Strategic Directions International. Strategic
> Directions International estimates that DNA sequencing serves
> approximately 17% of this demand for genetic analysis.

B0581-B0693 (Helicos 10-K) at B0587. As named inventor Dr. Quake's

company acknowledged in its SEC filings, by the time of the Helicos 10-K in

2007, systems and methods for DNA sequencing and genotyping had become

well understood, routine and conventional, and served a worldwide market of

approximately $5 billion. In its 10-K, Helicos also acknowledged

"**established** genomic analysis technologies," including sequencing, "next

generation sequencing" (which as explained in section VII.B.3. below is a

term that for pertinent purposes is used interchangeably with multiplex

sequencing or high-throughput sequencing), and genotyping (B0581-B0693

Helicos 10-K) at B0589:

A38

| Comparison of established genomic analysis technologies | | | | |
|---|---|---|---|---|
| **Analysis** | **Description** | **Technology** | **Advantages** | **Disadvantages** |
| Sequencing | Determination of the complete sequences of DNA or RNA molecules | Automated Sanger-based instruments | • Comprehensive sequence information<br>• Industry standard technology | • High cost<br>• Low throughput<br>• Complex sample preparation |
| Next Generation Sequencing | Determination of the complete sequences of DNA and RNA molecules | Ensemble-on-bead based technologies | • Comprehensive sequence information<br>• High throughput/lower cost per sequence<br>• Seen as "upgrade" to Sanger sequencers | • Complex sample preparation<br>• Limited scalability<br>• High cost of sample preparation<br>• Limited quantitation |
| Gene Expression Analysis | Detection and quantitation of RNA to determine gene expression levels | DNA arrays on chips or beads | • Can perform genome-wide analysis of expressed genes<br>• Widely available | • Low sensitivity<br>• Relative quantitation<br>• Limited sequence information<br>• Limited to known genomic sequences<br>• Biased based on templates |
| | | RT-PCR | • Absolute quantitation<br>• Highest sensitivity | • Higher cost per gene than arrays<br>• Labor intensive<br>• Not scalable |
| Genotyping | Analysis of short specific sequences within genomic DNA to look for known variants | DNA arrays on chips or beads | • High throughput/low cost per genotype<br>• Can be applied to large numbers of samples | • Provides only limited genomic information<br>• Only interrogates known sequence variants |
| | | RT-PCR | • Higher sensitivity than arrays | • Provides very limited genomic information<br>• Higher cost per genotype than arrays<br>• Biased based on templates |

72.     The Patents' written description itself describes the recited methods as conventional. I summarize portions of the Patents' written description identifying the conventional nature of the recited method steps in turn below.

### 1.     Obtaining Or Providing a Biological Sample Containing Cell-Free Nucleic Acids From a Transplant Recipient

73.     '652 Patent Claim element 1(a), '497 Patent Claim element 1(c), and '607 Patent Claim element 1(a) recite providing or obtaining a sample comprising cell-free nucleic acids from a transplant recipient. Techniques for providing or

A39

obtaining such samples were routine long before the 2009 filing of the Patents, which the Patents' written description confirms.

74.     Obtaining and studying biological samples of cell-free nucleic acids from an individual was routine and conventional by 2009. As the Patents' written description explains, circulating or cell-free DNA was already well characterized in the prior art. B0001-B0024 ('652 Patent) at B0012, 6:57-58 ("[c]irculating, or cell-free, DNA was first detected in human blood plasma in 1948.").

75.     Techniques for obtaining biological samples were routine, conventional and well-established by 2009. For example, venipuncture, or the science of making punctures in a patient's vein with a needle in order to draw blood from the vein, was well known in the prior art. *Id*. at B0014, 10:11-12 (emphasis added) ("To obtain a blood sample, ***any technique known in the art may be used***, e.g., a syringe or other vacuum suction device ...").

76.     The '607 Patent, at Claim element 1(b), further recites extracting cfDNA from the plasma sample. This also was routine by 2009, with numerous options for commercial kits available to carry it out.

77.     The Patents do not purport to claim an improvement over or nonconventional application of the traditional laboratory techniques for obtaining or providing biological samples comprising cell-free nucleic acids. I also have seen no indication in the claims or written description of the Patents that demonstrates an

A40

improvement over or nonconventional application of those conventional techniques

or a new or unique way of carrying them out.

> **2. Genotyping The Transplant Donor And/Or Recipient To Establish Profiles Of Genetic Polymorphisms (Or SNPs), Including By Comprising Selectively Amplifying At Least 1,000 SNPs By PCR And Sequencing**

78.    The '652 and '497 Patent claims also recite "genotyping" to establish

"profiles" of "SNPs" or "polymorphisms," including homozygous and/or

heterozygous variants. *See* '652 Patent claim element 1(b) and '497 Patent claim

elements 1(a) and (b). The '607 Patent, at elements 1(c)-(e), claims a generalized

and conventional method for genotyping, reciting "performing a selective

amplification of target [DNA] sequences" that "amplifi[es] … at least 1,000

[homozygous and/or heterozygous] [SNPs]" by [PCR]" (Claim 1(c)), followed by

"high throughput sequencing" (Claim 1(d)), and then "providing sequences" of the

"[SNPs]" (Claim 1(e)). These claim limitations describe what a POSA in 2009

would recognize as a common approach to genotyping, including based on targeted

PCR amplification and sequencing.

79.    A POSA in 2009 would recognize that the Patents claim these steps at

a high level without purporting to describe any improvements to then-existing

genotyping techniques. As the written description explains, numerous techniques

were known as of the November 6, 2009 filing date—including numerous

A41

commercially available options—for accomplishing the genotyping and SNP/polymorphism profiles recited in the claims.

80.    The written description explains that:

Genotyping of the transplant donor and/or the transplant recipient **may be performed by any suitable method known in the art including those described herein such as sequencing, nucleic acid array or PCR**. …
In some embodiments, the marker profile is a polymorphic marker profile. Polymorphic marker profile may comprise one or more single nucleotide polymorphisms (SNP's) ….

B0001-B0024 ('652 Patent) at B0019, 20:31-44 (emphasis added); *see also id.* at B0014, 9:8-14 ("Detection, identification and/or quantitation of the donor-specific markers (e.g. polymorphic markers such as SNPs) can be performed using real-time PCR, chips (e.g., SNP chips), **high-throughput shotgun sequencing** of circulating nucleic acids (e.g. cell-free DNA), **as well as other methods known in the art including the methods described herein**.") (emphasis added).

81.    Moreover, literature from as early as 2003 confirms that as of that time, approximately 2.8 million SNPs had been identified and were available in public databases. *See, e.g.*, B0086-B0093, (HapMap Project) at B0089; *see also* B0094-B0155 (International Human Genome Sequencing Consortium 2001) at B0094, B0098-B0099, B0101, B0145, B0148; B0156-B0163 (Human Genome Project NIH FAQ) at B0159; B0164-B0183 (1000 Genome Project) at B0164. Thus, the written description acknowledges, and the literature confirms (as also discussed in more detail below), that routine techniques including sequencing, nucleic acid array and

A42

PCR were available and used for genotyping up to thousands (or more) of SNPs by 2009.

(a)    **PCR, Including Selective Amplification, Was a Well-Understood, Routine and Conventional Method For Genotyping By 2009**

82.    PCR, including selective amplification, was a well-understood, routine and conventional method for genotyping by 2009. The written description describes PCR-based commercial products that were available at the time of filing to perform the claimed methods under the heading "Genotyping":

> For example, after genotyping a transplant donor and transplant recipient, ***using existing genotyping platforms known in the art including the one described herein***, one could identify approximately 1.2 million total variations between a transplant donor and transplant recipient. Usable SNPs may comprise approximately 500,000 ***heterozygous*** donor SNPs and approximately 160,000 ***homozygous*** donor SNPs. ***Companies*** (such as Applied Biosystems, Inc.) ***currently offer both standard and custom-designed TaqMan probe sets*** for SNP genotyping that can in principle target any desired SNP position for a ***PCR-based assay*** (Livak, K. L., Marmaro, J., Todd, J. A., Nature Genetics, 9, 341-342 (1995); De La Vefa, F. M., Lazaruk, K. D., Rhodes, M. D., Wenz, M. H., Mutation Research, 573, 111-135 (2005)). With such a large pool of potential SNPs to choose from, a ***usable subset of existing or custom probes*** can be selected to serve as the probe set for any donor/recipient pair."

B0001-B0024 ('652 Patent) at B0016, 13:51-67 (emphasis added). As noted by the dates of the references cited in this portion of the written description, these PCR-based tools for genotyping SNPs, including for genotyping up to hundreds of thousands of SNPs, were commercially available as far back as 1995.

A43

83. By 2000, PCR had been universally adopted as a standard tool in applications of molecular biology, and it was already successful in the simultaneous detection of thousands of SNPs. *See e.g*., B1291-B1300 (Germer 2000) at B1291. In fact, by 2009, PCR was also being widely used to measure SNPs in cell-free DNA. *See, e.g*., B0191-B0212 (Mei 2005) at B0196; B0213-B0223 (Lichtenstein 2001) at B0214. PCR was a well-established, conventional and indispensable tool for genetic testing that was routinely used to target and amplify specific, pre-selected genes for further study. *See e.g.*, B0001-B0024 ('652 Patent) at B0016, 14:29-67.

84. By 2009, PCR also was commonly used to amplify nucleic acids, including to selectively amplify nucleic acids, in order to obtain sufficient amounts of them for "sequencing." As discussed in more detail below, nucleic acid sequencing is the process of determining the nucleic acid sequence, or the order of nucleotide bases, in a nucleic acid. "High-throughput sequencing" as recited in '607 Patent Claim element 1(d) (and '497 Patent Claim element 1(d)) is a term commonly understood in the art of nucleic acid analysis to refer to sequencing technologies that sequence multiple DNA molecules in parallel. As discussed in section VII.B.3. below, this, too, had been widely accepted and had become a routine tool for nucleic acid analysis by 2009.

85. For example, by 2008, a product called RDT 1000 from the company RainDance Technologies combined "targeted sequencing" by PCR of "hundreds to

A44

thousands of genomic loci." B0224-B0225 (RainDance 2008) at B0224. As the manufacturer indicated, "[t]he RDT 1000 fits seamlessly into any targeted sequencing workflow," and its "'open' design easily integrates with all next-generation DNA sequencing platforms." *Id.*

86.  Several other products for selective amplification were on the market by November 6, 2009, including from Agilent Technologies, Roche, and Febit. *See, e.g.*, B0226-B0243 (Volkerding 2009) at B0233. For example, in a Review article in 2009, Volkerding *et al.* described several "targeted genomic resequencing" products available at the time that combine selectively amplifying "polymorphisms" and other genetic regions of interest, and then sequencing them using multiplex or high-throughput sequencing instruments. *Id.* Volkerding *et al.* identified using "[c]apture probes [] immobilized on a solid surface," as provided in the Roche NimbleGen product, Agilent products, and Febit products, or capture probes that are "used in solution," as in other Agilent products. *Id.* These arrays could capture up to "350,000" sequences. *Id.* Using these products, the target DNA for selective amplification would be captured by probes on an array or in solution, then "the enriched DNA amplified by PCR before NGS [*e.g.,* high-throughput sequencing] library preparation." *Id.*

87.  I also have significant experience using these standard PCR techniques for genotyping prior to 2009. Starting in 1992, I ran a large program at the Salk

A45

Institute using PCR to assay polymorphic genetic markers to produce a map of human chromosome 11, a project that required tens of thousands of multiplexed PCR reactions. Between 1994 and 1996, while at Stanford University, I was responsible for the design and conduct of hundreds of thousands of PCR reactions for mapping the entire human genome and as part of developing a strategy for sequencing regions of human chromosomes 4 and 21. After joining The Institute for Genomic Research in 1997, I was responsible for projects involving hundreds of thousands of PCR reactions for genome sequencing and microarray analysis. And after joining the faculty at the Dana-Farber Cancer Institute and Harvard School of Public Health, I led large-scale projects analyzing gene expression in cancer and establishing high-throughput genome sequencing that required PCR and other amplification reactions from diverse biological samples, including cell lines, human tissue samples, circulating tumor cells, and circulating cell-free DNA. In all of these projects, I used standard and routine PCR applications for genotyping.

> **(b)** **Arrays Were a Well-Understood, Routine and Conventional Method For Genotyping By 2009**

88.    Use of arrays was also a well-understood, routine and conventional method for genotyping by 2009. The written description states that genotyping SNPs could also be executed using arrays, including commercially available arrays manufactured by Illumina, Inc., ParAllele, and Affymetrix. B0001-B0024 ('652 Patent) at B0013, 8:55-60; B0018, 17:40-18:53.

A46

89.    DNA microarrays were developed in the 1990s and essentially allow the detection of many unique fragments of DNA in parallel. DNA microarrays are based on the simple concept of printing specific sequences of DNA fragments onto different spots on a glass and detecting complementary sequences of DNA that bind to each spot. Using DNA fragments containing SNPs was a routine application of this technology. Indeed, Affymetrix developed the first commercial microarray system (the Affymetrix GeneChip®) in 1994, and in 1999, released an array called GeneChip HuSNP, consisting of a panel of 1,200 SNPs printed onto the array.

90.    After the human genome was sequenced and the HapMap project was launched in 2002, there was intense interest in developing SNP arrays that could measure enough SNPs to genotype the entire genome of an individual on a single array. The NIH selected ParAllele and Illumina as two of the five US HapMap project participants responsible for genotyping. *See* B0244-B0250 (Ogren 2003) at B0248. In connection with this, ParAllele partnered with Affymetrix to develop a universal array system that could be used with any custom SNP. Illumina similarly adapted its GoldenGate® Assay to be used with a universal BeadChip to analyze large numbers of SNPs. The Illumina and ParAllele/Affymetrix arrays became standard SNP genotyping platforms by the time the HapMap project was launched in 2002.

A47

91. Applied Biosystems TaqMan probe sets were first described in 1995 by Kenneth J. Livak and Jeffrey Marmaro. *See* B0184-B0185 (Livak 1995) at B0184-B0185. This technology uses fluorescently-labeled probes targeting specific SNPs as a simple variation of the primers used in standard PCR. Because the amplification of DNA can be detected and quantified in real time, i.e., as the PCR assay progresses, this methodology is often called "real-time PCR" or "quantitative PCR." Thus, methods of SNP-typing using fluorescent TaqMan probes and real-time PCR were established almost a decade before the filing date of the Patents.

92. I have significant personal experience using these standard and routine arrays for genotyping prior to 2009. For example, I was involved in the early development of DNA microarrays while at Stanford University and was hired by TIGR in 1997 in large part to establish and lead a large-scale effort to establish and use microarrays to understand gene function. My group developed DNA microarray technology for profiling gene expression in humans, mouse, rat, zebrafish, many bacterial species, other mammalian species, plant species including *Arabidopsis*, maize, tomato, potato, rice, and eukaryotic parasites such as *Plasmodium falciparum,* the causative agent of malaria. As part of my recruitment to Dana-Farber in 2005, I negotiated access to commercial microarrays including Affymetrix GeneChips™ and Illumina arrays and I was involved in projects that used both gene

A48

expression and SNP genotyping data. In all of these applications, I used standard and routine commercially available array applications for genotyping.

**(c)    Sequencing Was a Well-Understood, Routine and
Conventional Method For Genotyping By 2009**

93.    Sequencing was also a well-understood, routine and conventional method for genotyping by 2009. For example, the written description states that:

> Genotyping donor and recipient nucleic acids, and/or detection, identification and/or quantitation of the donor-specific nucleic acids after transplantation (e.g. polymorphic markers such as SNPs) can be performed by sequencing such as whole genome sequencing or exome sequencing. Sequencing can be accomplished through classic Sanger sequencing methods which are well known in the art.

B0001-B0024 ('652 Patent) at B0017, 15:1-8. The Patents also explain that:

> Genotyping of donor and recipient can establish a single nucleotide polymorphism (SNP) profile for detecting donor DNA. Shotgun sequencing of cell-free DNA in plasma, with analysis of observed unique SNPs, allows quantitation of % donor DNA.

*Id.* at B0018, 17:32-36; *see also id.* at B0019, 20:31-36 ("Genotyping of the transplant donor and/or the transplant recipient may be performed by any suitable method known in the art including those described herein such as sequencing, nucleic acid array or PCR. In some embodiments, genotyping of the transplant donor and/or the transplant recipient is performed by shotgun sequencing.").

94.    I have significant personal experience using these standard and routine multiplex / high-throughput sequencing techniques for genotyping prior to November 6, 2009. For example, when I began working in the biological sciences at

A49

the Salk Institute in 1992, the first molecular biology techniques that I learned were PCR and Sanger DNA sequencing. As part of my move to Stanford University in 1994, I was tasked with developing a new large-scale DNA sequencing method based on PCR mapping of transposon insertions. My recruitment to the Dana-Farber Cancer Institute in 2005 was largely based on the expectation that high throughput DNA sequencing would soon generate unprecedented quantities of data that could be used to understand cancer. And that expectation very quickly was realized throughout the genomics field.

95.    Due to the   rapid explosion in use of sequencing-by-synthesis instruments including the 454 sequencer in 2005, the Illumina Genome Analyzer and Applied Biosystems SOLiD sequencer in 2006, and others shortly thereafter, my group and I quickly became involved in multiplex / high-throughput (or Next Generation Sequencing ("NGS")) DNA sequencing. By 2009, my group and I were routinely analyzing DNA sequence data generated on nearly every multiplex or high-throughput (*e.g.,* NGS) platform available at the time.

96.    In addition, in 2008, while a scientific advisor at Helicos Biosciences, I wrote a scientific paper with scientists at Helicos exploring applications of high throughput DNA sequencing entitled "What would you do if you could sequence everything?" that reported on a wide variety of applications, including genotyping.

A50

B0251-B0259 (Kahvejian 2008). By 2009, I was routinely using multiplex / high-throughput sequencing for a wide variety of applications including genotyping.

**(d)    The Patents Claim No Improvements To Or Nonconventional Uses Of The Conventional Genotyping Methods Available In 2009**

97.    The claims recite no improvements to these common approaches to "genotyping," nor any novel way of carrying them out; rather the Patents explain that the "existing genotyping platforms known in the art" can be employed, handling up to hundreds of thousands of heterozygous and homozygous "[u]sable SNPs," and note that "[c]ompanies … currently offer both standard and custom-designed TaqMan probe sets for SNP genotyping that can in principle target any desired SNP position for a PCR-based assay." B0001-B0024 ('652 Patent) at B0016, 13:58-64. Consistent with the disclosure of the Patents, and my own experience as a researcher in the genomics field in 2009, a POSA understood "genotyping," including using "selective amplification … by … PCR," and establishing "polymorphism" or "SNP" "profiles" including homozygous or heterozygous variants to be a routine and conventional practice.

98.    A declaration submitted to the USPTO during prosecution of the '652 Patent further confirms that the recited genotyping limitations were routine and conventional as of 2009. In order to overcome a rejection by the patent examiner, a scientist who worked in named inventor Stephen Quake's Stanford laboratory

A51

submitted a declaration, dated January 30, 2014, to "demonstrate that genotype information obtained from a transplant recipient can be used to establish a polymorphism profile to detect donor-derived cell-free nucleic acids in a sample from the transplant recipient." B0260-B0263 (Beausang Dec.).  In his declaration, the scientist, Mr. John Beausang, describes an analysis he had performed using the claimed methods. *Id.* He states that "[g]enotypes of the transplant recipients were obtained from genomic DNA using the Illumina Omni1-Quad Beadchip following standard protocols." *Id.* I am familiar with the Illumina BeadChip, which as discussed above in paragraph 89,was available by 2002 and was routinely used by researchers for genotyping to obtain polymorphism, including SNP, profiles following standard protocols by 2009.

### 3. Performing Multiplex Or High-Throughput Sequencing Of (Or Digital PCR On) The cfDNA To Detect The Genotyped Polymorphisms (Or SNPs)

99.    Claim element 1(c) of the '652 Patent recites "multiplex sequencing of the cell-free nucleic acids in the sample followed by analysis of the sequencing results using the polymorphism profile." Claim element 1(d) of the '497 Patent recites "determining an amount of donor-specific cell-free nucleic acids by … high-throughput sequencing or [dPCR]." Claim element 1(d) of the '607 Patent recites "performing a high throughput sequencing reaction … compris[ing] … sequencing-by-synthesis." These also were standard techniques for analyzing nucleic acids by

A52

the time of the November 6, 2009 filing date, and they were routinely used by that time to analyze cell-free nucleic acids in samples.

(a) **Background On Multiplex / High Throughput Sequencing Technology**

100.   As explained above, methods for determining the exact sequences of the bases in a stretch of DNA – called sequencing – were well known as of November 6, 2009. *See, e.g.*, B0001-B0024 ('652 Patent) at B0017, 15:6-8. Methods for simultaneously sequencing multiple stretches of DNA in a high-throughput instrument – called multiplex or high-throughput sequencing, also known as Next Generation Sequencing or "NGS" – also were well known and routinely used as of November 6, 2009. *See, e.g.*, *id.* at B0017, 15:8-16:41. The terms "multiplex sequencing" as recited in the '652 Patent, and "high-throughput sequencing" as recited in the '497 and '607 Patents, were used interchangeably by POSAs in the field of nucleic acid analysis in 2009 when the Patents were filed. These terms were understood by POSAs (both in 2009 and now) to include parallel sequencing methods using automated instrumentation.

101.   "Sequencing-by-synthesis," as recited in the '607 Patent claims, is a sequencing technique that by 2009 was one of the multiplex or high-throughput sequencing techniques most routinely used in the field of nucleic acid analysis. It involves determining the sequence of a particular nucleic acid by synthesizing a strand complementary to it inside of a sequencing machine. In the sequencing-by-

A53

synthesis reaction, the bases being added are "tagged" in an identifiable manner, such that the sequencing machine can tell what base is being added at each position, and therefore identify the complete sequence of the nucleic acid that is being sequenced. Because nucleic acids, particularly DNA, form double-stranded structures through complementary binding and specific base-pairing, if a POSA knows the sequence of the strand that is newly sequenced, she can deduce the sequence of the complementary strand being interrogated.

102.    The specification also describes a "shotgun" sequencing approach for sequencing circulating nucleic acids. *Id*. at B0014, 9:8-14. ("Detection, identification and/or quantitation of the donor-specific markers (e.g. polymorphic markers such as SNPs) can be performed using real-time PCR, chips (e.g., SNP chips), high-throughput shotgun sequencing of circulating nucleic acids (e.g. cell-free DNA), as well as other methods known in the art including the methods described herein."). Shotgun sequencing is a general strategy that was developed in the 1980s.  B0264-B0274 (Hutchison) at B0268; B0275-B0285 (Green 2001) at B0276, B0281, B0282.   In shotgun sequencing, multiple overlapping "reads" for the target DNA are obtained by performing several rounds of sequencing of DNA fragments. After all the fragments are sequenced, computer programs use the overlapping ends of different reads to assemble them into a continuous sequence.

A54

**(b)** **Commercially Available Multiplex And High-Throughput Sequencing Platforms As Of 2009**

103. Multiplex and high-throughput sequencing techniques, including sequencing-by-synthesis techniques, had been in use for more than a decade before the 2009 filing date of the Patents. For example, a method called pyrosequencing, which performs sequencing-by-synthesis, was developed and first published in 1993. B0286-B0290 (Nyren 1993); *see also* B0291-B0300 (Ronaghi 2001). It was the foundation for different companies. PYROSEQUENCING AB, out of Uppsala Sweden, launched its first commercial automated pyrosequencing instrument in 1999. B0694-B0903 (Marsh 2007) at B0713. Another is called 454 Life Sciences, Inc. (later acquired by Roche Diagnostics, Inc.). *See also* B0001-B0024 ('652 Patent) at B0017, 15:38-45 (disclosing using 454 sequencers as embodiments of the claimed methods); B0309-B0312 (Coombs) at B0311. 454 Life Sciences commercially launched its first sequencing instruments in 2005. B0301-B0308 (Heather 2016) at B0303; B0309-B0312 (Coombs) at B0311. Based on the machines made available by Pyrosequencing, by the year 2000, pyrosequencing had established itself as a standard and conventional means for multiplex or high-throughput sequencing, including for genotyping SNPs. *See, e.g.*, B0313-B0320 (Ahmadian 2000 at B0313, B0318); B0074-B0079 (Nordstrom 2000) at B0074, B0078; B0291-B0300 (Ronaghi 2001) at B0292-B0293.

A55

104.   Another high throughput sequencing-by-synthesis method developed by a group out of Cambridge University in 1998 became the foundation for a company called Solexa (later acquired by Illumina, Inc.). Solexa commercially launched its first sequencing instrument, the "Genome Analyzer," in 2006. B0321-B0323 (Illumina, History of Sequencing by Synthesis, available at https://www.illumina.com/science/technology/next-generation-sequencing/illumina-sequencing-history.html); *see also* B0001-B0024('652 Patent) at B0017, 15:53-60;  B0017-B0018,16:57-17:13 (disclosing using Solexa instruments including the Genome Analyzer as embodiments of the claimed method).  As the group that developed this technology reported in Margulies 2005, the instrument branded as the Genome Analyzer could "sequence 25 million bases, at 99% or better accuracy, in one four-hour run," B11305-1309 (Margulies 2005) at B1305 (Abstract), and had an average read length of 108 bases, *id.* at B1307, Table 1.

105.   Illumina acquired Solexa in 2007.  Illumina provides a comprehensive line of products for large scale analysis of genetic variation and biological function, including genotyping and sequencing.  In 2007, in a 10K SEC filing, Illumina reported that its "[i]nstrument revenue increased by $77.6 million over prior year, of which $68.7 million was due to increased sales of our sequencing systems, particularly the Genome Analyzer and cluster stations." By the end of 2008, Illumina

A56

reported revenue of $573 million for its products. B0904-B0994 (Illumina 10K) at B0927. Illumina reported that its "Instrument revenue increased by $64.8 million over prior year, of which $63.0 million was due to increased sales of our sequencing systems. This increase in revenue can be primarily attributed to shipments of our second generation Genome Analyzer, the Genome Analyzer II (GAII)." *Id.* at B0935. Illumina's Genome Analyzer, which was in widespread routine use by 2009, is cited in the written description as an example product capable of performing the claimed laboratory techniques. B0001-B0024 ('652 Patent) at B0017, 16:50-59; B0018, 17:1-12; B0022, 26:47-52; *see also* B0260-B0263 (Beausang Decl.) at B0260-B0261.

106. As another example, a high throughput sequencing method co-developed by the named inventor Dr. Quake became the foundation for his company, Helicos, which was founded in 2003, and on which I was a member of the Scientific Advisory Board. Helicos commercially launched its first sequencing instrument, the HeliScope, in 2008. B0581-B0693 (Helicos 10K 2008); *see also* B0001-B0024 ('652 Patent) at B0017, 15:22-37; B0018, 17:22-28 (disclosing using Helicos instruments as embodiments of the claimed method).

107. The written description also describes the Pico Titer Plate device manufactured by 454 Lifesciences, Inc. as a commercial product for performing the recited sequencing element. *Id*. at B0017, 15:38-46. The Pico Titer Plate device,

A57

available as of 2006, combines conventional PCR amplification with
pyrosequencing in a high throughput, automated format. The Pico Titer Plate was
one of the first next generation multiplex sequencing instruments developed, and
was in common usage as of 2009. B0226-B0243 (Voelkerding 2009) at B0227.

108.   The acceleration of nucleic acid sequencing technology before 2009
was incredibly rapid, with authors of a pertinent review article describing:

> The capabilities of DNA sequencers have grown at a rate even faster
> than that seen in the computing revolution described by Moore's law:
> the complexity of microchips (measured by number of transistors per
> unit cost) doubles approximately every two years, while sequencing
> capabilities between 2004 and 2010 doubled every five months. The
> various offshoot technologies are diverse in their chemistries,
> capabilities and specifications, providing researchers with a diverse
> toolbox with which to design experiments.

B0301-B0308 (Heather 2016) at B0305; *see also* B0324-B0333 (Morozova (2008)
at B0324 ("A new generation of sequencing technologies, from Illumina/Solexa,
ABI/SOLiD, 454/Roche, and Helicos, has provided unprecedented opportunities for
high-throughput functional genomic research. To date, these technologies have been
applied in a variety of contexts, including whole-genome sequencing, targeted
resequencing, discovery of transcription factor binding sites, and noncoding RNA
expression profiling."); *id.* at B0331 (noting that the commercially available high
throughput sequencers "have provided genome-scale sequencing capacity to
individual laboratories").

A58

109.   In an article published in March 2009, named inventor Dr.  Quake reported a study on sequencing using the 454 FLX and Solexa DNA platforms, both of which are described as commercially available in the Patents. B0334-B0345 (White 2009) at B0334; *see also* B0001-B0024 ('652 Patent) at B0017, 15:38-60. In that publication, Dr. Quake states that high-throughput sequencing technologies such as 454 and Solexa that are "based on sequencing by synthesis and sequencing by ligation are revolutionizing biology, biotechnology, and medicine," and are a "key advance facilitating higher throughput and lower costs for several of these platforms was migration from the clone-based sample preparation used in Sanger sequencing to the massively parallel clonal PCR amplification of sample molecules on beads (Roche 454 and ABI Solid) or on a surface (Solexa)." B0334-B0345 (White 2009) at B0334.

110.   By November 2009, POSAs also routinely used multiplex or high-throughput sequencing to detect SNPs in samples. This is confirmed, for example, in a scientific paper by Shen *et al.*, B0346-B0354 (Shen 2010), published online on December 17, 2009, titled "A SNP Discovery Method To Assess Variant Allele Probability From Next-Generation Resequencing Data." Shen *et al*. explain that "[i]n recent years, next-generation sequencing (NGS) technologies have propelled the rapid progress of genomics studies []. Continuous improvement in NGS technologies are increasing the throughput while lowering costs, thus enabling ultra-

A59

large-scale sequencing efforts." *Id*. at B0346. The authors explain that [c]urrently,

there are several methods available for detecting SNPs from NGS data," listing

several examples, and further explain that they have provided a "freely available

software package, Atlas-SNP2" to reduce error rates in interpreting sequencing data.

*Id*. at B0346-B0347.

111.   Based on my review of the literature and my own experience as a

researcher active in cfDNA analysis in 2009, there were a number of commercially

available sequencers from which to choose to carry out what the Patent claims

describe at a high level as "multiplex" or "high-throughput" "sequencing," including

what the Patents describe as "sequencing-by-synthesis."

112.   The Patents' disclosure acknowledges these numerous commercial

providers of multiplex or high-throughput sequencing instruments as of the time the

Patents were filed. For example, the written description states that:

> Detection, identification and/or quantitation of the donor-specific
> markers (e.g. polymorphic markers such as SNPs) can be performed
> using real-time PCR, chips (e.g., SNP chips), **high-throughput
> shotgun sequencing** of circulating nucleic acids (e.g. cell-free DNA),
> **as well as other methods known in the art including the methods
> described herein**.

B0001-B0024 ('652 Patent) at B0014, 9:8-14 (emphasis added). The Patents

disclose, under the heading "Sequencing," *id.* at B0017, 15:1, numerous examples

of commercial products that can carry out the multiplex or high-throughput

A60

sequencing (including sequencing by synthesis), including those discussed above, such as:

- "technology available by Helicos Biosciences Corporation [] such as the Single Molecule Sequencing by Synthesis (SMSS) method," *id.* at B0017, 15:22-25;

- "technology available by 454 Lifesciences," *id.* at B0017, 15:39;

- "fiber optics detection [as] described in Marguiles, M., et al.," *id.* at B0017, 15:46-52;

- "Clonal Single Molecule Array (Solexa, Inc.) or sequencing-by-synthesis (SBS) utilizing reversible terminator chemistry," *id.* at B0017, 15:53-56;

- "AnyDot-.chips (Gonovoxx, Germany)," *id.* at B0017, 15:61-65; and

- "sequencers such as the Illumina Genome Analyzer," *id.* at B0017, 16:57-59.

113. Furthermore, a declaration submitted by Mr. Beausang to the USPTO during prosecution of the '652 Patent, in order to overcome rejections by the patent examiner, further confirms that the multiplex and high-throughput sequencing limitations were routine and conventional as of 2009. In his declaration, Mr. Beausang states that in carrying out the method recited in the '652 Patent claims, "[s]equencing libraries were constructed from cell-free DNA using commercially available kits and sequenced following standard protocols using an Illumina GAII sequencer." B0260-B0263 (Beausang Decl.) at B0260-B0261. I am familiar with the Illumina GAII sequencer, which was routinely used in 2009 by researchers, including myself, using commercially available kits and standard protocols.

A61

**(c)    Sensitivities And Error Rates Inherent In The Available Sequencing Instruments**

114.   The Patent claims further recite certain levels of sensitivity in the claimed methods, for example at '652 Patent claim element 1(d), which recites "wherein sensitivity of the method is greater than 56% compared to sensitivity of current surveillance methods for cardiac allograft vasculopathy (CAV)"[13]; and at '497 Patent claim element 1(d) and '607 Patent claim element 1(f), which recite detection when the donor-specific circulating cell-free nucleic acids make up "at least 0.03% of the total circulating cell-free [nucleic acids/[DNA]]" in the sample. These sensitivity levels are not improvements over the methods already available, nor do the Patents disclose or claim any nonconventional use of the available methods in order to achieve a particular sensitivity. Rather, the recited sensitivites

---

[13] I do not believe a POSA would understand the meaning of the phrase "wherein sensitivity of the method is greater than 56% compared to sensitivity of current surveillance methods for cardiac allograft vasculopathy (CAV)" of '652 Patent claim element 1(d), as it makes no sense in the context of the claims. For example, "sensitivity" can have different meanings and there are different ways to measure it depending on what it refers to. For example, there is a level of "sensitivity" inherent in the sequencing methods recited in the claims that can be measured in one of several different ways based on the outcome of the sequencing instrument. There is also a  clinical "sensitivity" inherent in the method based on how accurate the method is in identifying those patients who have organ transplant rejection or failure. The claim does not convey to a POSA what "sensitivity" it refers to or how it is measured. Notwithstanding, regardless of what the "sensitivity" in the claim refers to or how it is measured, it is an inherent feature of the claimed methods and neither the claims nor the written description refer to any improved or nonconventional way of achieving a specific level of "sensitivity' beyond what inherently results from the use of the conventional methods recited.

A62

are inherent features of standard use of the methods, which themselves are routine and conventional.

115.   For example, as to '652 Patent claim element 1(d), the Patents' written description explains that "[t]he invention provides methods that are sensitive and specific," and "[i]n some embodiments, the methods described herein have at least 56% sensitivity." B0001-B0024 ('652 Patent) at B0021, 23:31-36. A POSA would understand this is an inherent feature of the recited method, based on the conventional techniques recited. The Patents' written description states that "[t]he practice of the present invention employs, unless otherwise indicated, conventional techniques … which are within the skill of the art. …" *Id.* at B0012, 5:36-49. The written description does not anywhere indicate that the methods are practiced in a nonconventional way to achieve greater than 56% sensitivity compared to sensitivity of then-current surveillance methods for CAV – or compared to any other metric for that matter.

116.   Furthermore, to the extent the element "sensitivity of the method is greater than 56%" ('652 Patent claim element 1(d)) refers to the sensitivity of a clinical diagnosis, this would be an inherent outcome of practicing the routine, conventional method steps. In a clinical diagnosis, "sensitivity" refers to the ability of the test to correctly identify those with the condition – here transplant rejection or failure (*i.e.*, true positive rate). There is nothing inventive about reciting a sensitivity

A63

greater than 56% compared to anything. As far as the claims are concerned, a sensitivity of greater than 56% is slightly better odds than flipping a coin in terms of diagnosing transplant rejection or failure. Indeed, even a test that identifies every transplant recipient as undergoing transplant rejection or failure would have a 100% sensitivity rate (because the group would include all patients undergoing rejection/failure)--but the test would be useless because it would not eliminate false positives (it would also include patients who were not actually undergoing rejection/failure). The written description contains no explanation of a nonconventional way of achieving even 56% sensitivity (which, in my opinion, would be ineffective at diagnosing transplant rejection or failure as the claims purport in any event).

117. The written description only describes at a high level "sensitive and non-invasive methods, devices, compositions and kits for monitoring organ transplant patients, and/or for diagnosing or predicting transplant status or outcome (e.g. transplant rejection)," and the lowest sensitivity described in the patent is 56%. B0001-B0024 ('652 Patent) at B0021, 23:32-36 ("In some embodiments, the methods described herein for diagnosing or predicting transplant status or outcome have at least 56%, 60%, 70%, 80%, 90%, 95% or 100% sensitivity. In some embodiments, the methods described herein have at least 56% sensitivity."). The written description does not indicate any nonconventional technique for arriving at

A64

this (albeit clinically ineffective) sensitivity for diagnosis – to the contrary it lacks any explanation as to how this sensitivity is achieved. Accordingly, a POSA would know that a sensitivity of at least 56% would have to be (and is) an inherent result of using the claimed techniques.

118. As to sensitivity of the sequencing methods, including as recited in '497 Patent claim element 1(d) and '607 Patent claim element 1(f), wherein detection occurs when the donor-specific circulating cell-free nucleic acids make up "at least 0.03% of the total circulating cell-free [nucleic acids/[DNA]]" in the sample, the Patents' written description states that "[h]igher sensitivity can be achieved simply by sequencing more molecules, i.e., using more channels." B0001-B0024 ('652 Patent) at B0018, 17:12-13. The written description also explains that, for example, "[c]urrently, sequencers such as the Illumina Genome Analyzer have read lengths exceeding 36 base pairs," *id.* at B0017, 16:57-59, and that "[o]n the Genome Analyzer … If one wants to establish a lower limit of sensitivity for this method by requiring at least 100 donor molecules to be detected, then it should have a sensitivity capable of detecting donor molecules when the donor fraction is as low as 0.03%." *Id.* at B0018, 17:1-11. This is merely states, again, an inherent feature of the conventional sequencing instruments, in standard use, as recited in the claims.

119. Indeed, it was well-known in the art by November 6, 2009 that "[h]igher sensitivity can be achieved simply by sequencing more molecules," as the

written description states. *See* B0001-B0024 ('652 Patent) at B0018, 17:12-13. The

written description acknowledges that "[t]here are two components to sensitivity: (i)

the number of molecules analyzed (depth of sequencing) and (ii) the error rate of the

sequencing process." *Id.* at B0017, 16:52-55. POSAs prior to November 6, 2009

were well aware that sequencing more molecules, or increasing sequencing depth,

improves sensitivity. As Voelkerding *et al*. explained in a 2009 review article

reviewing multiplex / high-throughput (NGS) sequencing technology: "Accuracy in

NGS is achieved by sequencing a given region multiple times, enabled by the

massively parallel process, with each sequence contributing to 'coverage' depth."

B0226-B0243 (Voelkerding 2009) at B0236. In another example, Thomas *et al.* in

2006 noted that "[s]equence variants that represent a fraction of a complex sample

can be vastly oversampled, thus enabling statistically meaningful quantification of

low-abundance variants." B1301-1304.1 (Thomas 2006) at B1301. This is further

demonstrated in Thomas 2006 at Supplemental Figure 2, which shows that the

detection limit is determined by sequencing error rate and sequencing read depth

(*i.e.*, how many molecules are sequenced), reflecting the fact that there was a well-

known correlation between the number of molecules sequenced and sensitivity

including limit of detection of donor fraction. *Id.* at B1304.1.

120. The '607 Patent, at claim element 1(d), also recites that "said

sequencing-by-synthesis reaction has a sequencing error rate of less than 1.5%."

This, too, is a feature inherent in common methods of using the sequencing instruments disclosed in the written description. In the context of the Patents, the sequencing error rate is an estimate of the proportion of all bases (often expressed as a decimal) sequenced by a sequencer that are incorrect. These errors can be caused by a combination of problems, for example, during sample preparation, misidentification of single base additions by the sequencer, background noise, or some combination of these and other factors. The Patents' written description explains that "it is possible to systematically lower the sequencing error rate by resequencing the sample template multiple times, as has been demonstrated by Helicos BioSciences (Harris, T.D. et al., Science, 320, 106-109 (2008))." B0001-B0024 ('652 Patent) at B0018, 17:22-26. The written description further explains that, as to the numerous commercial sequencing platforms disclosed in the patents, "[t]ypical sequencing error rates for base substitutions vary between platforms, but are between 0.5-1.5%." *Id.* at B0018, 17:20-21. Thus, as the Patents' written description recognizes, error rates were inherent in the recited sequencing techniques, and methods for lowering sequencing error rates were already known and established in the field before the Patents were filed.

121.    The literature as of 2009 confirms that the recited sensitivity levels were inherent in the conventional use of the sequencing instruments at the time. For example, in a paper co-authored by Patent inventor Stephen Quake, Harris *et al.*,

A67

Science (2008) 320:106-109, B0355-B0359, the authors explain the science behind the inherent sequencing error rates in Helicos sequencing technology. The authors also describe inherent error rates significantly lower than 1.5%. *Id.* at B0357.

**(d)     Digital PCR Methods Were Routine And Commercially Available In 2009**

122.    '497 Patent claim element 1(d) recites, as an alternative to high-throughput sequencing, a technique called digital PCR, or "dPCR." This technique also was known and conventional as of 2009. For example, the written description cites to and incorporates by reference a 2006 publication disclosing its use, at B0001-B0024 ('652 Patent) at B0016, 14:58-67.

**(e)     The Patents Claim No Improvements To Or Nonconventional Uses Of The Conventional Multiplex/High-Throughput Sequencing Or dPCR Methods Available In 2009**

123.    The "multiplex sequencing" and "high-throughput sequencing" (and "dPCR") techniques recited in the claims of the Patents refer to a broad range of well-established and routine parallel sequencing technologies, including sequencing-by-synthesis, as of 2009. The Patents recite using them only at a high level of generality, and do not purport to improve on them or claim any nonconventional use of them.

A68

### 4. Quantifying The Transplant cfDNA In The Sample, Using The Polymorphisms / SNPs In The Sequences

124. Claim element 1(d) of the '652 Patent recites "determining a quantity of the donor cell-free nucleic acids based on the detection of [donor and recipient cell-free nucleic acids] by the multiplexed sequencing." Claim element 1(d) of the '497 Patent recites "determining an amount of donor-specific cell-free nucleic acids … by detecting a homozygous or a heterozygous SNP within the [donor cell-free nucleic acids]." Claim element 1(f) of the '607 Patent recites "quantifying an amount of [transplant cfDNA] … using markers distinguishable between … recipient and … donor … wherein said markers … comprise [SNPs] selected from said at least 1,000 [SNPs]." These quantification steps are broadly recited with no further specificity. A POSA would have understood that they could employ any of a wide range of standard techniques for quantifying nucleic acids, which were already well known and established by the filing date of the Patents.

125. The Patents' written description explains that "[d]etection, identification, and/or quantification of the donor-specific markers (e.g., polymorphic markers such as SNPs) can be performed using real-time PCR, chips (e.g., SNP chips), high-throughput shotgun sequencing of circulating nucleic acids (e.g. cell-free DNA), as well as other methods known in the art including the methods described herein." B0001-B0024 ('652 Patent) at B0014, 9:8-14. This is also described elsewhere in the written description, for example *id*. at B0020, 21:5-9,

A69

which states that "[t]he presence or absence of one or more nucleic acids from the transplant donor in the transplant recipient may be determined by any suitable method known in the art including those described herein such as sequencing, nucleic acid arrays or PCR."

126. Quantification of SNPs based on multiplex or high-throughput sequencing data was a well-known and routine practice by the time of the 2009 filing date of the Patents. I, myself, was researching cancer-related polymorphisms, including SNPs, present in cfDNA in cancer patients using high-throughput sequencing data at that time. For example, my position at Dana-Farber involved contributing to developing analytic methods for the processing, including quantification, of DNA sequencing data generated by multiplex or high-throughput sequencing. This included analysis, including quantification, of sequencing data from cancer cell lines, bulk tumor samples, circulating tumor cells, and cell-free nucleic acids. Using multiplex or high-throughput sequencing to generate quantitative sequencing data, including from cfDNA, was a routine practice by November 6, 2009, and I used standard techniques for generating such sequencing data in my own experience.

127. By November 2009, POSAs were routinely publishing data generated by multiplex or high-throughput sequencing to quantify SNPs, including for the purpose of detecting different genotypes in a sample. For example, in a scientific

A70

paper published by Sampson and Zhao, B0360-B0388 (Statistical Applications in Genetics and Molecular Biology (2009) 8(1):1-27, titled "Identifying Individuals in a Complex Mixture of DNA with Unknown Ancestry"), the authors described use of high-throughput sequencing data, including as generated from "Illumina" instruments, to "determine whether a specific individual contributes DNA" to "a mixture of DNA samples from numerous individuals." B0360-B0388 (Sampson 2009) at B0360-61. The authors provide algorithms for determining "allele frequencies," which a POSA would understand describes determining quantities of SNPs, from this data. *Id.* at, *e.g.,* B0362. The authors further examine and compare SNP frequency data generated on high-throughput sequencing platforms, such as Illumina's, to such data generated on other types of platforms. *Id.* at B0368; *see also id.* at B0361 (explaining the platforms being tested are "e.g. Illumina, Affymetrix").

128.    The claims of the Patents recite quantifying donor cell-free nucleic acids only at a high level, and do not specify any particular technique for doing so. The claims do not purport to provide any innovative or nonconventional method for quantifying polymorphisms or SNPs in cell-free nucleic acids based on sequencing data. Nor do the claims purport to claim any improvement over the existing means for doing so as of 2009.

A71

C.     **The Claimed Combinations Of Steps For Detecting Multiple Genomes In A cfDNA Sample Were Conventional**

1.     **The Patents' Written Description States That The Laboratory Techniques In The Claims As A Whole Were Conventional As Of 2009**

129.   As I note above, the Patents' written description states that "[t]he practice of the present invention employs, ***unless otherwise indicated***, ***conventional techniques*** of immunology, biochemistry, chemistry, molecular biology, microbiology, cell biology, genomics and recombinant DNA, ***which are within the skill of the art***." B0001-B0024 ('652 Patent) at B0012, 5:36-40 (emphasis added). I did not find any indication in the Patents that the claimed combination of laboratory techniques was nonconventional, or carried out in a way that modifies or improves upon the traditional combination of these laboratory techniques.

130.   To the contrary, the Patents' written description states that the combination of elements in the claims was routine and carried out using commercial products without modification at the time of the Patents' filing date. For example, the Patents' written description states that "***[g]enotyping***[14] donor and recipient nucleic acids, and/or detection, identification and/or ***quantification of the donor-specific nucleic acids***[15] after transplantation (e.g. ***polymorphic markers such as***

_____

[14] '652 Patent claim element 1(b); '497 Patent claim elements 1(a) and (b); '607 Patent claim element 1(c).

[15] '652 Patent claim element 1(d); '497 Patent claim elements 1(d) ; '607 Patent claim element 1(f).

A72

SNPs)[16] *can be performed by sequencing*[17] such as whole genome sequencing or

exome sequencing." B0001-B0024 ('652 Patent) at B0017, 15:2-6 (emphasis

added). The written description, in the same section, identifies several commercial

multiplex and high-throughput sequencing[18] platforms routinely used to carry out

this combination of steps by the 2009 filing date. *Id.* at B0017-B0018, 15:22-17:28

(further disclosing the inherent sensitivities and error rates inherent in the standard

use of the sequencing equipment); see also section VI.B above.

131.    The written description identifies obtaining or providing a sample of

cell-free nucleic acids[19] as routine and conventional, and does not identify any

nonconventional way of obtaining a sample that is used with the claimed

combination. *See* section VII.B. above.

132.    As to the '607 Patent, the written description does not indicate anything

nonconventional about "selective amplification of … at least 1,000 [SNPs] … by

PCR," as recited in claim element 1(c), or its combination with high throughput

sequencing as recited in elements 1(d) and (e) to quantify the cfDNA as recited in

---

[16] '652 Patent claim element 1(b); '497 Patent claim elements 1(a) and (b) ; '607
Patent claim element 1(f).
[17] '652 Patent claim element 1(c); '497 Patent claim elements 1(d) ; '607 Patent
claim elements 1(d) and (e).
[18] '652 Patent claim element 1(c); '497 Patent claim elements 1(d) ; '607 Patent
claim element 1(d).
[19] '652 Patent claim element 1(a); '497 Patent claim elements 1(c) ; '607 Patent
claim elements 1(a) and (b).

A73

element 1(f). Rather, again, the written description explains that "*[g]enotyping* donor and recipient nucleic acids, and/or detection, identification and/or *quantitation* of the donor-specific nucleic acids after transplantation (e.g. *polymorphic markers such as SNPs*) *can be performed by PCR*." B0001-B0024 ('652 Patent) at B0016, 14:29-32 (emphasis added). The written description describes commercially available PCR-based products that were routinely used to genotype and quantitate SNPs as of 2009, stating that with these products, "[u]sable SNPs may comprise approximately 500,000 heterozygous donor SNPs and approximately 160,000 homozygous donor SNPs," and that "[c]ompanies … currently offer both standard and custom-designed TaqMan probe sets for SNP genotyping that can in principle target any desired SNP position for a PCR-based assay." *Id.* at B0017, 13:55-64.

133. Moreover, the written description does not indicate anything nonconventional about selectively amplifying 1,000 SNPs (or even 10,000 SNPs as recited in dependent claim 5) and combining that with high-throughput sequencing of the selectively amplified DNA. Indeed, contemporaneous literature indicates that was conventional, and numerous commercial products were available to perform it. *See, e.g.* B0224-B0225 (RainDance 2008) (describing commercial product for amplifying thousands of SNPs and combining with subsequent high-throughput sequencing by synthesis); B0226-B0243 (Volkerding 2009) (review article

A74

describing several different products for "targeted genomic resequencing," including to detect "polymorphisms," that involve up to hundreds of thousands of capture probes to "enrich[]" for the target polymorphisms, "with the enriched DNA amplified by PCR before NGS [*e.g.*, high-throughput sequencing] library preparation").

134.  In fact, the written description does not mention sequencing of selectively amplified cfDNA at all – there is no reference to it in the specification. The written description does not indicate that the claimed method performs this combination by modifying the recited laboratory techniques or using them in a nonconventional way, nor does it state this is an improvement over the methods the written description otherwise describes as conventional. *See* B0001-B0024 ('652 Patent) at B0012, 5:36-40 ("The practice of the present invention employs, unless otherwise indicated, conventional techniques … which are within the skill of the art.").

135.  Thus, each of the combinations of the claims of the Patents as a whole is described in the written description as conventional and routinely performed, including by commercial instruments, as of the Patents' filing date.

A75

### 2. POSAs Have Long Recognized That The Same Methods For Detecting Fetal, Cancer, And Infectious cfDNA Could Be Used To Detect Transplant cfDNA

136. By 2009, the combinations of laboratory techniques claimed in the Patents were well understood, routine and conventional methods for quantifying cfDNA having different genotypes in a biological sample. Other scientists including myself had established, and were routinely using, the claimed combination of laboratory techniques for quantifying fetal cfDNA in samples from a pregnant woman, cancer cfDNA in samples from a cancer patient, and bacterial or viral cfDNA in samples from an infected patient or an infected animal, among other applications, as I discuss in more detail below. POSAs prior to 2009 stated that these same methods could be used to detect and quantify cfDNA from any of these sources, and acknowledged that they also applied to detecting transplant donor-derived cfDNA in an organ transplant recipient's sample.

137. Indeed, the Patents' written description recognizes that common approaches were being applied broadly to study transplant rejection/failure, pregnancy, cancer, and other conditions in which cell-free nucleic acids representing different genotypes are present in a patient's circulation. *See, e.g.*, B0001-B0024 ('652 Patent) at B0012, 6:67-7:5; *id.* at B0013, 7:16-19 (explaining through examples that "results collectively establish both circulating DNA, either free in plasma or from circulating cells, as a useful species in cancer detection and

A76

treatment"); *id.* at B0013, 7:19-23 (explaining with examples that "[c]irculating DNA has also been useful in healthy patients for fetal diagnostics, with fetal DNA circulating in maternal blood serving as a marker for gender, rhesus D status, fetal aneuploidy, and sex-linked disorders"); *id.* at B0013, 8:1-21 (explaining with examples that "results establish that for heart transplant patients, donor-derived DNA present in plasma can serve as a potential biomarker for the onset of organ failure"). As the written description explains, and a POSA in the relevant November 2009 period appreciated, the approaches to detecting and quantifying foreign or abnormal cell-free nucleic acids could be broadly applied to many natural phenomena:

> In all these applications of circulating nucleic acids, the presence of sequences differing from a patient's normal genotype has been used to detect disease. In cancer, mutations of genes are a tell-tale sign of the advance of the disease; in fetal diagnostics, the detection of sequences specific to the fetus compared to maternal DNA allows for analysis of the health of the fetus. … [A]s cell-free DNA or RNA often arises from apoptotic cells, the relative amount of donor-specific sequences in circulating nucleic acids should provide a predictive measure of on-coming organ failure in transplant patients…

B0001-B0024 ('652 Patent) at B0013, 7:30-46.

138. Consistent with the Patents' disclosure, the application of methods for detecting fetal and cancer cell-free nucleic acids to detecting analogous transplant-related natural phenomena was well-accepted among POSAs. The named inventors of the Patents have acknowledged this not only in the Patents, but also in other

A77

publications. For example, in 2011 Stanford published a report in one of its newsletters quoting two of the named inventors – Steven Quake and Hannah Valantine. They explained that the application of known methods for detecting fetal cfDNA to the analogous phenomenon of transplant cfDNA was the basis for their idea underlying the Patents. As the Stanford newsletter reported:

> The current study began when Valantine noticed research by Quake in 2008 showing that it is possible to detect fetal chromosomal abnormalities by sequencing cell-free DNA fragments in a maternal blood sample.
>
> "When I saw that, I thought, wow, this technique could probably be used to monitor heart rejection," said Valantine, **noting that cells damaged during rejection also release DNA into the circulatory system**.
>
> "Hannah sought me out and I realized that an organ transplant can also be thought of as a genome transplant," said Quake. "***Someone else's genome is in your body. So by looking at variations in the DNA sequence, we can identify which DNA segments come from the new heart, and which come from you.***"

B0389-B0391    (https://med.stanford.edu/news/all-news/2011/03/to-better-detect-heart-transplant-rejections-scientists-test-for-traces-of-donors-genome.html) (emphasis added).

139. Similarly, a 2014 article in a Stanford Engineering publication described the Patent inventors' adaptation of a method for fetal testing into the foundation for the Patents' methods as follows:

A78

The cell-free DNA technique hinges on the existence in the genome of naturally occurring regions of variation called single nucleotide polymorphisms, or SNPs. In 2008, Hannah Valantine, then a Stanford professor of cardiology, ***realized that a DNA-sequencing technique developed in Quake's lab to pick out small quantities of fetal DNA from a pregnant woman's blood might also be useful to track the fate of a transplanted organ.***

B0392-B0394 (Stanford Engineering 2014) at B0393 (emphasis added).

140. POSAs up to more than a decade before the 2009 filing date of the Patents recognized the ease of applying routine methods for detecting foreign genomes to the detection of transplant cfDNA. For example, in 1998 Lo *et al.* reported in a publication that: "We have shown that DNA from fetuses is present in the plasma of their mothers, and now suggest that, ***in transplant patients, DNA from the organ donor may also be present in the plasma of the recipient***." B0080-B0081 (Lo 1998) at B0080 (emphasis added). The Lo group further recognized that "[s]ince graft rejection is an important cause of cell death in the transplanted organ, our observations raise the possibility that the concentration of donor DNA in the recipient's plasma may be a marker for rejection." B0080-B0081 (Lo 1998) at B0080.

141. Thereafter, and following the Human Genome Project's complete sequencing of the human genome in April 2003, methods were quickly developed, standardized, commercialized, and applied by POSAs to detect different genotypes in a single patient sample. *See, e.g.*, B0094-B0155 (2001 Human Genome Project)

A79

at B0098, B0101; B0156-B0183# (Human Genome Project NIH FAQ) at B0158, B0162; B0164-B0183 (1000 Genome Project) at B0164, B168. For example, in 2004, Ding *et al.* published a scientific paper describing laboratory techniques for detecting circulating cell-free nucleic acids that could be broadly applied to conditions involving different genotypes in a sample:

> These advances will help in catalyzing the clinical applications of fetal nucleic acids in maternal plasma. This analytical approach also will have ***implications for many other applications of circulating nucleic acids in areas such as oncology and transplantation***.

B0395-B0400 (Ding 2004) at B0395t (emphasis added). Ding 2004 also explained that, beyond detecting fetal cfDNA, the same laboratory techniques "could be extended to other areas of circulating nucleic acid analysis, including circulating tumor-specific DNA, such as Epstein–Barr virus DNA in nasopharyngeal carcinoma patients, KRAS point mutations, and donor-specific DNA in transplant recipients." *Id.* at B0399.

142.  Likewise, in a PCT patent application filed on July 9, 2004 and published March 17, 2005, Cantor *et al*. described a method for detecting different genotypes arising from a range of natural phenomena in a sample:

> The method allows accurate detection of nucleic acids that are present in very small amounts in a biological sample. For example, the method of the present invention is preferably used to detect fetal nucleic acid in maternal blood sample; circulating tumor-specific nucleic acids in a blood, urine or stool sample; and ***donor-specific acids in transplant recipients***. In another embodiment, one can detect viral, bacterial, fungal, or other foreign nucleic acids in biological sample.

A80

B0995-B1049 (WO 2005/023091) ("Cantor 2005"), at B0995, Abstract (emphasis added).

143.   Similarly, in a PCT patent application filed March 26, 2007 and published March 26, 2008, B1050-B1104 (WO2008/118988 A1) ("Ehrich 2008"), Ehrich *et al*. described a laboratory technique for detecting and analyzing a range of different types of circulating cell-free nucleic acids, noting that "[i]n addition to prenatal applications, the methods find utility in a range of applications, including, but not limited to, detecting rare cancer mutations, ***detecting transplant rejection*** and forensics." B1050-B1104 (WO2008/118988 A1) ("Ehrich 2008") at B1067, 17:20-22(emphasis added).

144.   In another example, Lo *et al.* filed a PCT patent application on July 23, 2008, which published on January 29, 2009, B1105-B1219 (PCT Application No. WO2009/013492) ("Lo PCT 2009"). At paragraph [0003], the Lo group described a method for "determining a nucleic acid sequence imbalance," which "generally relates to the diagnostic testing of genotypes and diseases by determining ***an imbalance between two different nucleic acid sequences***…" The Lo group noted that the method relates "particularly to the identification of … mutations and genotypes in a fetus via testing of a sample of maternal blood," and "also relates to the detection of cancer, ***the monitoring of transplantation***, and the monitoring of infectious diseases." *Id*. (emphasis added).

A81

145.    In all of the above examples from the literature, scientists describe methods for analyzing different nucleic acid sequences, or genotypes, in the same sample. As these examples demonstrate, by the November 6, 2009 filing date of the Patents, POSAs recognized that the same laboratory techniques for detecting different genotypes in a cfDNA sample would apply to a range of natural phenomena, including fetal conditions, cancer, organ transplant monitoring, and infectious disease.

### 3.    POSAs Had Already Established The Claimed Laboratory Techniques By 2009 To Detect Multiple Genotypes In A Sample, Including In The Transplant Setting

146.    Confirming the Patents' disclosure of established methods known in the art, numerous prior and contemporaneous publications describe combining the claimed laboratory techniques to detect different genotypes in different contexts, including transplant, fetal, cancer, infectious disease, and others.

147.    I provide other non-exhaustive examples here.

### (a)    Cantor et al. – 2007

148.    Cantor *et al.* filed a U.S. Patent Application on February 28, 2006, which published as B0401-B0427 (U.S. 2007/0207466) ("Cantor 2007") on September 6, 2007. Cantor 2007 describes a method for "***accurate detection of nucleic acids that are present in very small amounts in a biological sample … preferably used to detect*** fetal nucleic acid in maternal blood sample; circulating

A82

tumor-specific nucleic acids in a blood, urine or stool sample; and ***donor-specific acids in transplant recipients***." B0401-B0427 (Cantor 2007) at B0401, Abstract (emphasis added). Cantor 2007 explains the same method also "can detect viral, bacterial, fungal, or other foreign nucleic acids in biological sample." *Id.*

149.   Exemplary disclosures of Cantor 2007 describing the combination of Patent claim elements are included in the table below:

| Claim Element | Exemplary Disclosure |
|---|---|
| Obtaining a sample | Cantor described a method of detecting "foreign nucleic acids" "in a biological sample" such as a "blood sample," which a POSA would understand requires obtaining or providing a biological sample as recited in '652 Patent claim element 1(a) and '497 Patent claim element 1(c). *See* B0401-B0427 (Cantor 2007) at B0401, Abstract. Cantor also disclosed that certain embodiments are "a method for the detection of … mutations in maternal plasma…," which requires providing a plasma sample as recited in '607 Patent claim element 1(a). *Id.* at B0409, ¶ [0016]. |
| Genotyping to obtain a SNP profile | In an exemplary embodiment in the fetal context, Cantor disclosed that the method comprised "selecting one or more [SNPs]," then "determining the fetal genotype from a sample DNA isolated from the plasma, serum, or whole blood of the pregnant mother … [by] performing SNP[-specific] … primer-extension assay in several replicates…" B0401-B0427 (Cantor 2007) at B0411 ¶ [0023]. A POSA would understand this disclosure of Cantor to refer to genotyping to generate a polymorphic, particularly SNP, profile as disclosed in '652 Patent claim element 1(b) and '497 Patent claim elements 1(a) and (b). A POSA would further understand Cantor's disclosure of a "primer-extension assay" to refer to a form of amplification, such as PCR, and disclosure of a SNP-specific primer-extension assay as a form of selective amplification of SNPs by PCR, as recited |

A83

| | in '607 Patent claim element 1(c). *See, e.g., id.* at B0409, ¶ [0016] (describing "using methods such as the primer-extension of polymerase chain reaction (PCR) products"). |
|---|---|
| Multiplex / high-throughput sequencing-by-synthesis | Cantor disclosed numerous commercially available means for detecting the SNPs, including "pyrosequencing techniques (Pyrosequencing, Inc., Westborough, Mass.)." *Id.* at B0420-B0424 ¶ [0054]; [0063]. A POSA would understand this to be a type of multiplex, or high-throughput sequencing instrument that uses sequencing-by-synthesis, as recited in '652 Patent claim element 1(c), '497 Patent claim element 1(d), and '607 Patent claim elements 1(d) and (e). *See id.* at B0424, ¶ [0063] ("… PYROSEQUENCING™ (Uppsala, Sweden) [] essentially is sequencing by synthesis."). |
| Quantitating the foreign cfDNA | Cantor disclosed "quantitating the fetal nucleic acids or alleles using the methods of the present invention" disclosed in its written description. *E.g.,* B0401-B0427 (Cantor 2007) at B0415; B0420, ¶ [0036]; [0053]. A POSA would understand the disclosure of quantitating fetal alleles in Cantor to refer to quantifying or determining an amount of foreign cfDNA in the sample as recited in '652 Patent claim element 1(d), '497 Patent claim element 1(d), and '607 Patent claim element 1(f). |

150. As this exemplary disclosure of Cantor 2007 demonstrates, a POSA understood that as of the 2006 filing date of Cantor 2007, laboratory techniques were commercially available for carrying out the method of obtaining a sample—genotyping—sequencing—and quantifying cell-free nucleic acids as claimed in the Patents to detect different genotypes, including in the organ transplant context. The Patents do not claim any unconventional use of this combination of laboratory

A84

techniques described in Cantor 2007, nor do they claim any unique way of combining or using the techniques.

### (b) Lo et al. – 2009

151.   In another example, the Lo group described a method that "relates to the detection of cancer, ***the monitoring of transplantation***, and the monitoring of infectious diseases" in a U.S. Patent application filed on July 23, 2008 and published as U.S. 2009/0087847 ("Lo U.S. 2009"). B1220-B1290 (Lo U.S. 2009) at BB1252, ¶ [0003] (emphasis added).

152.   Exemplary disclosures of Lo U.S. 2009 describing the combination of Patent claim elements are included in the table below:

| Claim Element | Exemplary Disclosure |
| --- | --- |
| Obtaining a sample | Lo exemplified its disclosed method in an embodiment in which "plasma DNA will be extracted." B1220-B1290 (Lo U.S. 2009) at B1274, ¶ [0289]. That plasma DNA contains "maternal and fetal DNA in the plasma sample." *Id.* A POSA would understand that this disclosure in Lo requires providing or obtaining a biological sample, specifically a plasma sample from the blood, that contains different genotypes as recited in '652 Patent claim element 1(a), '497 Patent claim element 1(c), and '607 Patent claim elements 1(a) and (b), respectively. |
| Genotyping to obtain a SNP profile | Lo disclosed genotyping generally, at ¶ [0003], stating the disclosed method "generally relates to the diagnostic testing of genotypes and diseases by determining an imbalance between two different nucleic acid sequences…in a fetus…" and "also relates to the detection of cancer, the monitoring of transplantation, and the monitoring of infectious diseases." Lo described embodiments that evaluate a "clinically relevant |

A85

| | |
|---|---|
| | nucleic acid sequence," *id.* at B1254, ¶ [0059], against a "background nucleic acid sequence." *Id.* at B1254, ¶ [0060]. Lo described clinically relevant nucleic acid sequences as (among other things) "sequences which are mutated, deleted, or amplified in a malignant tumor, e.g. sequences in which loss of heterozygosity or gene duplication occur." *Id.* at B1254, ¶ [0059]. It described background nucleic acid sequences as (among other things) an allele from the same chromosome as a clinically relevant sequence, but nonetheless "distinct due to heterozygosity." *Id.* at B1254, ¶ [0060]. |
| | Lo also disclosed that in an example of the method, the fractional percentage of fetal material is "determined by measuring the amount of a fetal-specific marker (e.g. … genetic polymorphism markers (e.g. SNPs) … in relation to a non-fetal-specific marker." *Id.* at B1258, ¶ [0100]. Lo disclosed "determining the fractional concentration of fetal DNA … through the quantification of polymorphic differences between the pregnant woman and the fetus," citing references disclosing established techniques, and providing "[a]n example of this method … to target polymorphic sites at which the pregnant woman is homozygous and the fetus is heterozygous." B1220-B1290 (Lo U.S. 2009) at B1272-B1273, ¶ [0278]. |
| | A person of skill in the art would understand these disclosures as describing the kind of genotyping used to establish polymorphism or SNP profiles for different genotypes in the sample as recited in '652 Patent claim element 1(b), and '497 Patent claim elements 1(a) and (b). |
| Multiplex / high-throughput sequencing and digital PCR | Lo also described using commercially available digital PCR and multiplex/high-throughput (a.k.a. "massively parallel") sequencing instruments that were routinely used to carry out the techniques recited in '652 Patent claim element 1(c), '497 Patent claim element 1(d), and '607 Patent claim element 1(d). These Lo disclosures include using "microfluidics digital PCR chips," citing references dating back to 2006, and "massively parallel genomic sequencing," citing references |

A86

| | |
|---|---|
| | dating back to 2005. B1220-B1290 (Lo U.S. 2009) at B1263, ¶ [0176]. Lo U.S. 2009 disclosed several specific examples of the routine use of these commercial products, for example:<br><br>    Massively parallel sequencing, such as that achievable on the 454 platform (Roche) (Margulies, M. et al. 2005 Nature 437, 376-380), Illumina Genome Analyzer (or Solexa platform) or SOLiD System (Applied Biosystems) or the Helicos True Single Molecule DNA sequencing technology (Harris TD et al. 2008 Science, 320, 106-109), the single molecule, real-time (SMRT™) technology of Pacific Biosciences, and nanopore sequencing (Soni GV and Meller A. 2007 Clin Chem 53: 1996-2001), allow the sequencing of many nucleic acid molecules isolated from a specimen at high orders of multiplexing in a parallel fashion (Dear BriefFunct Genomic Proteomic 2003; 1: 397-416). Each of these platforms sequences clonally expanded or even non-amplified single molecules of nucleic acid fragments. As a high number of sequencing reads, in the order of hundred thousands to millions or even possibly hundreds of millions or billions, are generated from each sample in each run, the resultant sequenced reads form a representative profile of the mix of nucleic acid species in the original specimen.<br><br>B1220-B1290 (Lo U.S. 2009) at B1271, ¶ [0262]. |
| Quantitating the foreign cfDNA | As recited in '652 Patent claim element 1(d), '497 Patent claim element 1(d), and '607 Patent claim element 1(f), Lo described measuring "e.g., SNPs" to determine percentage of foreign cfDNA in the sample, whereby "[t]he actual measurement could be done by real-time PCR, digital PCR, sequencing reactions (including massively parallel genomic sequencing) or any other quantitative methods." B1220-B1290 (Lo U.S. 2009) at B1258, ¶ [0100]. In the Lo |

A87

| | exemplary fetal embodiment, "[t]he amount of maternal and fetal DNA in the plasma sample will be quantified, for example by the real-time PCR assays previously established … or other types of quantifier well known to those of skill in the art," citing references. B1220-B1290 (Lo U.S. 2009) at B1252, ¶ [0003]. |

153. A POSA would understand the combination of conventional and commercially available laboratory techniques disclosed in Lo U.S. 2009 for detecting and quantifying different genotypes in a sample to be the same combination of laboratory techniques claimed in the Patents. The Patents do not claim any nonconventional use of the combination of laboratory techniques described in Lo U.S. 2009, nor do they claim any unique way of combining or using the techniques. Though, like Cantor 2007 discussed above, Lo U.S. 2009 often applies the combination of techniques for detecting fetal cfDNA in maternal blood, Lo also recognized its applicability to the analogous natural phenomenon of transplant cfDNA in a transplant recipient's blood. B1220-B1290 (Lo U.S. 2009) at B1252, ¶ [0003]. Thus, like Cantor 2007, Lo U.S. 2009 confirms the conventionality and prior existence of the combination claimed in the Patents at least as of July 23, 2008 (the Lo U.S. 2009 filing date).

### (c)    Dhallan et al. – 2007

154. In another example, Dhallan *et al.* published a scientific paper in the journal Lancet at 369(9560):474-81 on February 10, 2007, B0428-B0435 ("Dhallan

A88

2007"). Like the preceding Cantor 2007 and Lo U.S. 2009 disclosures, Dhallan 2007 establishes the conventionality of the Patents' claimed combination for detecting multiple different genomes in a sample. The Dhallan 2007 authors note that "[t]he approach described here, which uses standard molecular biology equipment, allows for precise analysis of genetic material." *Id.* at B0434.

155.    Exemplary disclosures of Dhallan 2007 describing the combination of Patent claim elements are included in the table below:

| Claim Element | Exemplary Disclosure |
|---|---|
| Obtaining a sample | As recited in '652 Patent claim element 1(a), '497 Patent claim element 1(c), and '607 Patent claim element 1(a), Dhallan 2007 disclosed obtaining "formaldehyde-treated blood samples from [] pregnant women," and using "free fetal DNA" from the samples "to diagnose fetal chromosomal abnormalities." B0428-B0435 (Dhallan 2007) at B0428. The Dhallan "Methods" section states that plasma samples were prepared and cfDNA was extracted (as further recited in '607 Patent claim element 1(b)) using standard, then-available commercial products:<br><br>Plasma and buffy coat samples were isolated in accordance with methods described previously. Genomic DNA was purified from both the plasma fraction and buffy coat of the same maternal blood sample, and the buffy coat fraction of the paternal sample, with the QIAamp DNA Blood Maxi Kit (Qiagen, Valencia, CA, USA). … Plasma DNA was concentrated to 50-70 uL with a 10 kDa nominal molecular weight cutoff filter (Millipore, Bedford, MA, USA). |

A89

| | B0428-B0435 (Dhallan 2007) at B0429 (internal citations omitted). |
|---|---|
| Genotyping to obtain a SNP profile | Dhallan further described using the genotyping steps recited in '652 Patent claim element 1(b) and '497 Patent claim elements 1(a) and (b) (reciting genotyping to obtain polymorphism or SNP profiles, respectively), and '607 Patent claim element 1(c) (reciting selective amplification of at least 1,000 SNPs by PCR). Specifically, Dhallan disclosed that "SNPs were amplified from genomic DNA isolated from the maternal plasma … by PCR," *id.* at B0429-B0430, further noting that "the human genome project has identified over 3.7 million SNPs to date," making "[e]ven on the smallest human chromosome … about 54,000 genotyped SNPs [] available for analysis." *Id.* at B0434. Dhalla further disclosed genotyping homozygous and heterozygous SNPs, exemplifying that "[a]t certain SNP sites, the maternal genome will be homozygous for a nucleotide … while at the same site the paternal genome might be homozygous for a different nucleotide" such that "the fetal genome will be heterozygous [] at the SNP site." *Id.* at B0428. |
| Sequencing | Dhallan described performing sequencing using "sequencing gels." *Id.* at B0430. Though '652 Patent claim element 1(c), '497 Patent claim element 1(d), and '607 Patent claim element 1(d) recite performing sequencing by multiplex or high-throughput sequencing, one skilled in the art as of the 2009 filing date of the Patents would have understood that the same sequencing performed in Dhallan 2007 using sequencing gels could have been accomplished using any of the numerous commercial multiplex/high-throughput sequencers available at the time (*see* section VII.B.3. above). In my own experience, as confirmed by the literature, it was standard and routine as of 2009 to use the same type of sample preparation, cfDNA extraction, and genotyping/selective amplification techniques disclosed in Dhallan in combination with one of the many commercial multiplex/high-throughput sequencing instruments to generate sequencing results for quantification as further recited in the Patent claims. *See* section VII.B.2. above. |

A90

| Quantitating the foreign cfDNA | As recited in '652 Patent claim element 1(d), '497 Patent claim element 1(d) and '607 Patent claim element 1(f), Dhallan disclosed quantifying foreign cfDNA in the sample, stating that "us[ing] standard molecular biology equipment … [f]ree fetal DNA is directly quantified from the heterogeneous mixture of maternal and fetal DNA in the maternal plasma." *Id.* at B0434. |
|---|---|

156.   Thus, a POSA would understand from the Dhallan 2007 disclosure, just like from the other literature cited above, that by 2007, "standard" laboratory techniques were available and used to accomplish the techniques claimed in the Patents.

### (d)   Beck et al. – 2009

157.   In a further example, Beck *et al.* published a paper in the journal Clinical Chemistry at 55(4):730-738 in 2009 (B0436-B0444) ("Beck 2009"). Like the above-referenced literature, Beck 2009 demonstrates the conventionality of the Patents' claimed combination for detecting multiple genotypes in a sample. In the case of Beck 2009, the authors used the combination of techniques to detect both pathogens (*e.g.,* viruses) and mutated cfDNA in otherwise apparently healthy human subjects. Beck 2009 describes an overview of the methods used therein, stating: "Serum DNA from 51 apparently healthy humans was extracted, amplified, sequenced via pyrosequencing (454 Life Sciences/Roche Diagnostics), and

A91

categorized by (a) origin (human vs xenogeneic),[20] (b) functionality (repeats, genes, coding or noncoding), and (c) chromosomal localization." *Id.* at B0436, Abstract Methods.

158.   Exemplary disclosures of Beck 2009 describing the methods claimed in the Patents are included in the table below:

| Claim Element | Exemplary Disclosure |
|---|---|
| Obtaining a sample | As recited in '652 Patent claim element 1(a), '497 Patent claim element 1(c), and '607 Patent claim elements 1(a) and (b), Beck 2009 explained that "[s]erum samples were collected and stored," and that a commercial kit was used to extract the cell-free nucleic acids, wherein "[t]otal nucleic acids were extracted … with the High Pure Viral Nucleic Acid Kit (Roche Applied Science) according to the manufacturer's instructions." B0436-B0444 (Beck 2009) at B0437. The authors further stated that "[w]e also collected EDTA-anticoagulated samples of whole blood from a subgroup of the volunteers (2 females, 2 males) and extracted genomic DNA with standard protocols." *Id.* |
| Genotyping to obtain a SNP profile | Beck 2009 reported genotyping as recited in '652 Patent claim element 1(b) and '497 Patent claim elements 1(a) and (b) (reciting genotyping to obtain polymorphism or SNP profiles, respectively). Beck 2009 reported that "we have applied this high-throughput sequencing technology to generate an unbiased profile of the circulating DNA in healthy individuals." B0436-B0444 (Beck 2009) at B0437. Beck 2009 described using "the BLAST program," which is a publicly available database, as well as "a local install of the RepeatMasker software package (Institute for Systems Biology), which makes use of Repbase (version 12.09; Genetic Information Research Institute" and "querying |

---

[20] A POSA would understand the term "xenogenic" to mean nucleic acids that originate outside the subject itself, and are from a foreign substance introduced into the subject, such as a virus or other pathogen in the context of this study.

A92

| | databases of bacterial, viral, and fungal genomes, as well as the human genome (reference genome build 36.2)," including genomes "obtained from the National Center for Biotechnology Information (NCBI) (ftp://ftp.ncbi.nih.gov)." *Id.* These are all publicly available databases and software packages that include reference genomes for genotyping. The authors further compared the circulating cfDNA to genomic DNA in the subjects, looking for example, for polymorphic differences in single genes, repetitive elements, and foreign elements such as from non-human sources. *Id.* at B0438-B0439. |
|---|---|
| Multiplex / high-throughput sequencing | Beck 2009 described multiplex or high-throughput sequencing as described in '652 Patent claim element 1(c), '497 Patent claim element 1(d), and '607 Patent claim element 1(d), as well as sequencing by synthesis as recited in '607 Patent claim element 1(d). Specifically, Beck 2009 reported that "[t]he amplified DNA preparations were sequenced directly with a GS FLX genome sequencer (454 Life Sciences/Roche Diagnostics) according to the manufacturer's instructions." B0436-B0444 (Beck 2009) at B0437. As discussed in section VII.B.3. above, a POSA would understand the 454 sequencing instrument to employ sequencing-by-synthesis. |
| Quantitating the foreign cfDNA | As recited in '652 Patent claim element 1(d), '497 Patent claim element 1(d), and '607 Patent claim element 1(f), Beck 2009 disclosed quantifying foreign cfDNA in the sample, stating for example that "[t]o quantify the amounts of unidentified nucleotides, we counted and subtracted the masked nucleotides from the total nucleotide counts." *Id.* at B0437. The authors further described determining whether "representation of the different chromosomes in the serum [cfDNA] is correlated with chromosome gene density or GC content," which a POSA would understand to involve quantifying cfDNA to compare its "representation" or frequency in the cfDNA to that of genomic DNA. *Id.* at B0439. Beck 2009 also reported determining "representation of repetitive elements" in the cfDNA, which a POSA would |

A93

| | understand involves determining its relative fraction in the sample. |

159.    Thus, a POSA would understand from the Beck 2009 disclosure, just like from the other literature cited above, that by 2009, the methods claimed in the Patents were routinely being used to detect multiple genotypes in a cfDNA sample.

### (e)    Beck et al. – 2010

160.    In an additional example, Beck *et al.* published a scientific paper in the journal Molecular Cancer Research at 8(3):335-342, which was submitted to the journal on July 16, 2009 and published March 9, 2010 ("Beck 2010") that further establishes the conventionality of the Patents' claimed methods for detecting multiple genotypes in a sample, in this case in the context of cancer. B0445-B0453 (Beck 2010). I note that the submission date of July 16, 2009 indicates that the experiments underlying Beck 2010 were carried out before the Patents' earliest filing date of November 6, 2009. Beck 2010 reported that "[c]irculating nucleic acids (CNA) isolated from serum or plasma are increasingly recognized as biomarkers for cancers," and that related to the authors' work, "[i]dentification of specific breast cancer-related CNA sequences provides the basis for the development of a serum-based routine laboratory test for breast cancer screening and monitoring." B0445-B0453 (Beck 2010) at B0445, Abstract.

A94

161. Exemplary disclosures of Beck 2010 describing the claimed methods are included in the table below:

| Claim Element | Exemplary Disclosure |
|---|---|
| Obtaining a sample | As recited in '652 Patent claim element 1(a), '497 Patent claim element 1(c), and '607 Patent claim elements 1(a) and (b), Beck 2010 reported that serum samples were collected from breast cancer patients, and after storage, using standard, then-available commercial products, "serum was centrifuged at 4,000 x *g* for 20 min and 200 uL of the supernatant was used in the High Pure Nucleic Acids Extraction Kit (Roche) according to the instructions of the manufacturer." *Id.* at B0446. |
| Genotyping to obtain a SNP profile | Beck 2010 further reported the genotyping steps recited in '652 Patent claim element 1(b) and '497 Patent claim elements 1(a) and (b) (reciting genotyping to obtain polymorphism or SNP profiles, respectively). Specifically, Beck 2010 reported that "[c]ancer-specific DNA perturbations such as microsatellite instability, mutations, sequence length, and promoter methylation patterns detected in serum/plasma have been proposed for the diagnosis and clinical assessment of cancer treatment." *Id.* at B0446. Beck 2010 further reported analyzing repetitive elements based on "assigned nucleotides." *Id.*; *see also id.* at B0447. A POSA would understand that repetitive elements are a form of polymorphism that are prevalent in cancer. |
| Multiplex / high-throughput sequencing | Beck 2010 taught performing sequencing as recited in '652 Patent claim element 1(c), '497 Patent claim element 1(d), and '607 Patent claim element 1(d), which recite performing sequencing by multiplex or high-throughput sequencing, and by sequencing-by-synthesis, respectively. Specifically, Beck 2010 described sequencing "using a Roche/454 GS-FLX high-throughput sequencer," which as discussed in section VII.B.3. above, is a high-throughput sequencer that performs sequencing by synthesis. |

A95

| Quantitating the foreign cfDNA | As recited in '652 Patent claim element 1(d), '497 Patent claim element 1(d), and '607 Patent claim element 1(f), Beck 2010 described quantitating the abnormal cfDNA, in that case cancer-specific cfDNA. Specifically, they stated their results as "[h]igh-throughput sequencing of total serum DNA shows differential representation of certain repetitive elements in the CAN of patients with breast cancer compared with healthy controls." *Id.* at B0449. A POSA would understand that determining the "representation" of the analyzed polymorphisms involves quantifying them. A POSA would further understand that the statistical methods the authors used in Beck 2010 were standard and well-accepted means for quantifying data as of 2009. |
|---|---|

162.   Thus, a POSA would understand from the Beck 2010 disclosure, just like from the other literature cited above, that by 2009, the methods claimed in the Patents were routinely being used to detect multiple genotypes in a cfDNA sample.

### (f)    Gordon et al. – 2009

163.   In an additional example, Gordon *et al.* published a scientific paper in the journal Nucleic Acids Research at 37(2):550-556, which was published online December 5, 2008 and published in print in 2009. This paper also establishes the conventionality of the Patents' claimed methods for detecting multiple genotypes in a sample. B0454-B0460 ("Gordon 2009"). The authors explained that "[n]ext-generation sequencing provided broad elucidation of sample CNAs [circulating nucleic acids]," further explaining that "we detected infection-specific sequences…" in order to identify pathogens that cause chronic wasting disease in cattle and elk cfDNA. *Id.* at B0454, Abstract.

A96

164.   Exemplary disclosures of Gordon 2009 describing the claimed methods are included in the table below:

| Claim Element | Exemplary Disclosure |
|---|---|
| Obtaining a sample | As recited in '652 Patent claim element 1(a), '497 Patent claim element 1(c), and '607 Patent claim element 1(a), the Gordon 2009 authors explained that "[s]erum samples were obtained" from cattle and elk, and cfDNA was extracted using a commercial kit: "The WGA4 GenomePlex® Single Cell Whole Genome Amplification Kit (Sigma) was used for the nucleic-acid extraction … according to the manufacturer's protocol." *Id.* at B0455. |
| Genotyping to obtain a SNP profile | Gordon 2009 also reported using the genotyping steps recited in '652 Patent claim element 1(b) and '497 Patent claim elements 1(a) and (b) (reciting genotyping to obtain polymorphism or SNP profiles, respectively), and '607 Patent claim element 1(c) (reciting selective amplification of at least 1,000 SNPs by PCR). Gordon 2009 explained that "[a] total of 657,431 elk sequences were elucidated, including 401,733 from animals post-infection" and that they were "searched against the public protein and EST datasets" and matched against "public databanks" to genotype the subjects. *Id.* at B0456. The authors also reported that "[a] total of 595,037 quality bovine sequences were elucidated, including 311,786 from animals post-infection," which also were genotyped against public databases. *Id.* Gordon 2009 further described using selective amplification to amplify "3261 control-only motifs and 2896 motifs present in infected-only cows" using PCR under conditions a POSA would understand to be standard and conventional. *Id.* at B0455. |
| Multiplex / high-throughput sequencing | Gordon 2009 described using multiplex or high-throughput sequencing, including sequencing-by-synthesis, as recited in '652 Patent claim element 1(c), '497 Patent claim element 1(d), and '607 Patent claim element 1(d), respectively. Specifically, Gordon 2009 reported using "a Roche/454 genome sequencer (GS-FLx) according to the manufacturer's |

A97

| | instructions." *Id.* at B0455. A POSA would understand the 454 sequencer to be a high-throughput sequencer that uses sequencing by synthesis, as explained in section VII.B.3. above. |
|---|---|
| Quantitating the foreign cfDNA | In addition, as recited in '652 Patent claim element 1(d), '497 Patent claim element 1(d), and '607 Patent claim element 1(f), Gordon 2009 reported that the data generated in the study may be used for "targeted characterization and quantification of disease-specific DNAs." *Id.* at B0458. The authors further reported that "[t]he information from the elk study demonstrates that a time course analysis of the blood CNAs can greatly improve our ability to determine the diagnostic signals present" in such diseases. *Id.* at B0459. Accordingly, a POSA would understand that the combination reported in Gordon 2009 can readily include quantifying foreign cfDNA in the sample. |

165.    Thus, a POSA would understand from the Gordon 2009 disclosure, just like from the other literature cited above, that by 2009, the methods claimed in the Patents were routinely being used to detect multiple genotypes in a cfDNA sample.

**(g)    Holt et al. – 2009**

166.    Holt *et al.* published a scientific paper in the journal Bioinformatics, at 25(16):2074-2075, with advanced access publication on June 3, 2009. B0461-B0462 ("Holt 2009"). Holt 2009 also establishes the conventionality of the Patents' methods for detecting multiple genotypes in a sample. The authors explained that they "present a method for estimating the frequencies of SNP alleles present within pooled samples of DNA using high-throughput short-read sequencing." *Id.* at

A98

B0461, Abstract. They further note that "[t]he method was implemented in Perl and relies on the open source software Maq for read mapping and SNP calling." *Id.*

167.   Exemplary disclosures of Holt 2009 describing the claimed methods are included in the table below:

| Claim Element | Exemplary Disclosure |
|---|---|
| Obtaining a sample | '652 Patent claim element 1(a), '497 Patent claim element 1(c), and '607 Patent claim element 1(a) recite obtaining a sample of cell-free nucleic acids, and '607 Patent claim element 1(b) further recites extracting cfDNA from the sample. Holt 2009 analyzed a pool of DNA from six strains of the bacteria *Salmonella Patapyphi* A. *Id.* at B0461, Abstract. Though Holt 2009 did not use cfDNA obtained from blood as a sample, a POSA would appreciate that the same further combination of elements could be equally applied to the DNA extracted from a pool of bacteria as to the DNA extracted from a blood sample containing cfDNA. |
| Genotyping to obtain a SNP profile | Holt 2009 described using the genotyping steps recited in '652 Patent claim element 1(b) and '497 Patent claim elements 1(a) and (b) (reciting genotyping to obtain polymorphism or SNP profiles, respectively). Specifically, Holt 2009 explained that "[t]his approach facilitates genome-wide SNP detection among closely related isolates." *Id.* at B0461. For this study, Holt 2009 analyzed "a set of 403 SNPs" to generate profiles of allele frequencies that differed as between the strains in the pooled sample. *Id.* at B0461-B0462. The authors stated that their method "relies on opensource software Maq for read mapping and SNP calling," and that it is "freely available from ftp://ftp.sanger.ac.uk/pub/pathogens/pools/." *Id.* at B0461, Abstract. A POSA would understand this software for genotyping was standard and openly available as of 2009. |
| Multiplex / high- | As recited in '652 Patent claim element 1(c), '497 Patent claim element 1(d), and '607 Patent claim element 1(d), which recite multiplex or high throughput sequencing, and sequencing by |

A99

| throughput sequencing | synthesis, respectively, Holt 2009 disclosed "us[ing] the Illumina GAI to sequence pools of DNA." *Id.* at B0461. As discussed above in section VII.B.3., the Illumina Genome Analyzer (Illumina GAI) is based on Solexa high throughput sequencing technology that uses sequencing by synthesis. |
|---|---|
| Quantitating the foreign cfDNA | As recited in '652 Patent claim element 1(d), '497 Patent claim element 1(d), and '607 Patent claim element 1(f), Holt 2009 reported that the data generated in the study was used to quantify the SNPs being analyzed. Specifically, Holt 2009 described determining "[t]he frequency of each SNP [] in [the pools] … using information (read from Maq's pileup output) on each read [] of [] reads mapped to the SNP locus…." *Id.* at B0461. The authors described using standard technology available through the open software, wherein "[f]requencies were calculated according to the following formulae, implemented in a Perl script which calls Maq to do the initial read mapping and SNP calling…" *Id.* |

168. Thus, a POSA would understand from the Holt 2009 disclosure, just like from the other literature cited above, that by 2009, conventional laboratory techniques were available for obtaining a sample, genotyping, sequencing, and quantifying different genotypes in the sample.

### D. The Dependent Claims Also Recite Well-Understood, Routine and Conventional Steps

169. None of the dependent claims of the Patents add a nonconventional application or inventive concept to the claims. In my opinion, each dependent claim recites well-understood, routine and conventional steps to observe a natural phenomenon. All of the dependent claims of the Patents depend from, and

A100

incorporate by reference the limitations of claim 1 of the respective patents. I address the dependent claims, grouped by related claim elements, in turn below.

### 1. Dependent Claims Reciting Different Types Or Numbers Of Polymorphisms

170. Regarding the '652 Patent, dependent claim 2 recites different types of genetic polymorphisms of which the polymorphism profile of claim 1 may be comprised. Specifically, claim 2 recites use of a polymorphism profile that "comprises one or more genetic variations selected from single nucleotide polymorphisms (SNPs), variable number of tandem repeats (VNTRs), hypervariable regions, minisatellites, dinucleotide repeats, trinucleotide repeats, tetranucleotide repeats, simple sequence repeats, insertion elements, insertions, repeats, or deletions." Dependent claim 11 recites wherein the polymorphism profile of claim 1 comprises at least one SNP.

171. Regarding the '497 Patent, dependent claim 6 recites "at least ten different homozygous or heterozygous SNPs are detected." Dependent claim 17 recites that "the SNP profile comprises informative homozygous and heterozygous SNPs." Dependent claim 25 recites the homozygous or heterozygous SNP comprises a marker having at least two alleles, each occurring at a frequency greater than 1% of the population."

172. Regarding the '607 Patent, dependent claim 2 recites the "at least 1,000 [SNPs] comprise [SNPs] that occur at an allele frequency greater than 1% of a

A101

population. Dependent claim 3 recites the "at least 1,000 [SNPs] comprise homozygous [SNPs]." Dependent claim 4 recites the "selective amplification of target [DNA] sequences amplifies a plurality of genomic regions comprising at least 5,000 [SNPs]." Dependent claim 5 recites the "selective amplification of target [DNA] sequences amplifies a plurality of genomic regions comprising at least 10,000 [SNPs]."

173.   As explained above in section VII.B.2., genotyping to obtain a polymorphism profile comprising SNPs was well-understood, routine and conventional as of November 2009. As explained in section VII.B.4., it was also well-understood, routine, and conventional as of November 2009 to genotype homozygous and heterozygous SNPs, and SNPs that arise from various mutations including insertions, repeats, or deletions. In addition, the written description makes clear that it was conventional to genotype SNPs having alleles that each occur at a frequency greater than 1% of a population. B0001-B0024 ('652 Patent) at B0015, 11:22-31. Moreover, as explained above in section VII.C.1., it was conventional, including using commercially available kits and products, to genotype 5,000 SNPs, 10,000 SNPs, and many more. Accordingly, there is nothing nonconventional or innovative in the limitations recited in '652 Patent claims 2 and 11; '497 Patent claims 6, 17, 18, 24, and 25; '607 Patent claims 2, 3, 4, and 5.

A102

Case 1:19-cv-00662-CFC-JB   Document 162-1   Filed 02/20/2024   Page 109 of 176   PageID #:
2879
Case 1:19-cv-00662-CFC-JB   Document 162-1   Filed 02/20/2024   Page 130 of 142 PageID #:
2879

## 2. Dependent Claims Reciting Different Types Of cfDNA

174. Regarding the '652 Patent, dependent claim 3 recites wherein the cell-free nucleic acids of claim 1 are DNA.

175. Regarding the '497 Patent, dependent claim 12 recites "the donor-specific circulating cell-free nucleic acids … in the biological sample are DNA, RNA, mRNA, miRNA, double-stranded DNA, single-stranded DNA, single-stranded DNA hairpins, DNA/RNA hybrids, RNA hairpins, or a combination thereof."

176. It was routine and conventional as of Nov. 2009 to assay these recited types of nucleic acids using the claimed methods. The Patents' written description, again, states only at a high level of generality that "[n]ucleic acids from samples that can be analyzed by the methods herein include: double-stranded DNA, single-stranded DNA, single-stranded DNA hairpins, DNA/RNA hybrids, RNA (e.g. mRNA or miRNA) and RNA hairpins." B0001-B0024 ('652 Patent) at B0014, 10:45-51; *see id.* at B0016, 13:17-21. The Patents do not disclose or claim any nonconventional laboratory techniques for analyzing any of these types of nucleic acids.

177. Neither the Patents' written description nor their claims indicate any nonconventional approach to assaying these particular types of nucleic acids, or any innovation based on analyzing any particular form of nucleic acid over another.

A103

Accordingly, there is nothing nonconventional or innovative in the limitations recited in '652 Patent claim 3 and '497 Patent claim 12.

### 3. Dependent Claims Reciting Certain Common Modifications, Error Rates, Or Quality Scores Associated With Multiplexed Or High Throughput Sequencing

178. Regarding the '652 Patent, dependent claims 4 and 6 recite that the multiplexed sequencing of claim 1 is shotgun sequencing (claim 4) and sequencing at least ten different nucleic acids (claim 6).

179. Regarding the '497 Patent, dependent claim 3 recites a "high-throughput sequencing assay that generates at least 1,000 sequence reads per hour." Dependent claim 4 recites "a high-throughput sequencing assay" that comprises "a next-generation sequencing assay." Dependent claim 5 recites "the high-throughput sequencing assay generates sequencing reads of at least 36 bases." Dependent claim 19 recites that the "sensitivity of the method is greater than 56%." Dependent claim 21 recites a sequencing error rate of "less than 1.5%." Dependent claim 23 recites using a "quality score."

180. '607 Patent dependent claim 6 recites the "high throughput sequencing reaction comprises assigning a quality score to bases of said provided sequences."

181. As explained above in section VII.B.3., and is also evident from the literature and product-related publications, all of these limitations are either themselves conventional methods, or are features inherent in the standard use of the

A104

conventional methods recited in the independent claims from which they depend. For example, shotgun sequencing and next-generation sequencing are types of multiplex/high throughput sequencing that were well understood, routine and conventional as of Nov. 2009. In addition, high-throughput sequencing to generate at least 1,000 reads per hour ('497 Patent claim 3) and read lengths at least 36 bases long ('497 Patent claim 5) was inherent in all high-throughput sequencers available as of November 6, 2009, as demonstrated for example by Margulies *et al*., which published that the instrument which became branded as the Illumina Genome Analyzer "is able to sequence 25 million bases … in one four-hour run," and generates an "[a]verage read length (bases)" of "108." B1305-1309 (Margulies 2005) at B1305 (Abstract); B1307, Table 1.

182. Sequencing at least ten different nucleic acids using multiplex sequencing also was a standard application of the commercial multiplex sequencers at the time. For example, product literature from 2007 for the Illumina Genome Analyzer system states that an "excess of 2.6 billion bases of high-quality filtered data per paired-end run on a single flow cell (as of October, 2007)" could be achieved" (B0463-B0466) (Illumina 2007) at B0463 and the Illumina Genome Analyzer product literature from 2008 states that multiplexed sequencing of 96 different samples on a single flow cell could be achieved using their instrument. B0467-B0470, (Illumina 2008) at B0467.  Generation of at least 1,000 sequence

A105

reads per hour, and reads of at least 36 bases, also was a standard feature of the conventional operation of commercial high throughput sequencers in 2009. The Patents' written description states only at a high level of generality, in the "Sequencing" section generally discussing the multiple sequencing instrumentalities available in the market at the time, that:

> In some cases, high throughput sequencing generates at least 1,000, at least 5,000, at least 10,000, at least 20,000, at least 30,000, at least 40,000, at least 50,000, at least 100,000, or at least 500,000 sequence reads per hour, with each read being at least 50, at least 60, at least 70, at least 80, at least 90, at least 100, at least 120, or at least 150 bases per read.

B0001-B0024 ('652 Patent) at B0017, 15:12-18. The Patents do not disclose or claim any nonconventional use of the multiplex/high-throughput sequencing methods elsewhere (including in that section) described in the Patents. A POSA in 2009 would understand this is an inherent feature in the standard use of the conventional multiplex/high-throughput sequencing machines referred to in the Patents.

183.    The sequencing error rates and sensitivities also are inherent features of conventional use of the sequencing equipment, as discussed in section VII.B.3.c above.

184.    Using a quality score likewise was conventional practice when using the standard high throughput sequencers available in 2009. B0467-B0470 (Illumina 2008) at B0467, B0469; B0471-B0480 (Li 2009b) at B0473. Moreover, I note that

A106

the Patents' written description does not include any disclosure of nonconventional use of a quality score; rather, the only mention of "quality score" in the written description generically states that "[t]he use of quality scores for improved filtering of SNP calls, or the use of resequencing, should reduce error rate and increase sensitivity." B0001-B0024 ('652 Patent) at B0022, 26:51-53. The prior literature further described software that had already been developed and made commercially available before November 2009 to provide quality scores as recited in the Patent claims. *See, e.g.,* B0226-B0243 (Voelkerding 2009) at B0235 ("Image parameters such as intensity, background, and noise are then used in a platform-dependant algorithm to generate read sequences and error probability–related quality scores for each base. Although many researchers use the base calls generated by the platform-specific data-pipeline software, alternative base-calling programs that use more advanced software and statistical techniques have been developed.").

185.   Neither the Patents' written description nor the claims identify anything nonconventional or innovative about the limitations recited in these dependent claims. To the contrary, they are routine applications, or inherent features, of the multiplex / high throughput sequencers when used in conventional ways, including in the 2009 timeframe. Accordingly, there is nothing nonconventional or innovative in the limitations recited in '652 Patent claims 4 and 6; '497 Patent claims 3, 4, 5, 19, 21, and 23; and '607 Patent claim 6.

A107

### 4. Dependent Claims Reciting Organ or Species Limitations

186.   Regarding the '652 Patent, dependent claims 14 and 15 recite the transplant is selected from the group consisting of kidney, pancreas, liver, heart, lung, intestine, pancreas after kidney, and simultaneous pancreas-kidney (claim 14); or is heart or kidney (claim 15), respectively.

187.   Regarding the '497 Patent, dependent claim 9 recites wherein the transplant recipient is human.

188.   Each of these additional steps was well-understood, routine and conventional as of Nov. 2009, particularly when used in conjunction with monitoring of transplant status or rejection. The Patents' written description does not purport to attribute invention of any type of organ transplantation to the named inventors. Nor do the inventors contend they came up with the notion of analyzing the bodily fluid samples of human transplant recipients as opposed to those of some other species. *See* B0001-B0024 ('652 Patent) at B0012, 5:36-40. Accordingly, there is nothing nonconventional or innovative in the limitations recited in '652 Patent claims 7, 8, 9, 14, and 15; and '497 Patent claims 7, 8, 9, and 29.

### 5. Dependent Claims Reciting Conventional PCR Or Amplification Methods

189.   Regarding the '497 Patent, dependent claim 10 recites that "an amplification reaction is performed on the donor-specific circulating cell-free

A108

nucleic acids in the biological sample prior to determining the amount of donor-specific circulating cell-free nucleic acids … in the biological sample."

190.    As explained in section VII.B.2. above, performing an amplification reaction on donor cfDNA prior to quantifying it also was routine and conventional as of November 2009. Neither the Patents' written description nor the claims identify anything nonconventional or innovative about the limitation recited in this dependent claim. To the contrary, it was a standard application that was routinely used in the 2009 timeframe. Accordingly, there is nothing nonconventional or innovative in the limitation recited in '497 Patent claim 10.

### 6.    Dependent Claims Reciting Different Sample Types

191.    Regarding the '652 Patent, dependent claim 12 recites that the sample of claim 1 is blood or serum.

192.    Regarding the '497 Patent, dependent claims 2 and 27 recite that the sample of claim 1 is blood (claim 2) or plasma (claim 27), respectively.

193.    As explained above in section VII.B.1., obtaining a biological sample from a patient, including from blood, plasma, or serum, and including for use with the methods claimed in the Patent claims, was well-understood, routine and conventional as of Nov. 2009. Neither the Patents' written description nor the claims identify anything nonconventional or innovative about the limitations recited in these dependent claims. To the contrary, they are standard applications that were

A109

routinely used in the 2009 timeframe. Accordingly, there is nothing nonconventional or innovative in the limitations recited in '652 Patent claim 12 and '497 Patent claims 2 and 27.

### 7. Dependent Claims Reciting Further Genotyping Prior To Quantifying Cell-Free Nucleic Acids

194.    '497 Patent dependent claim 15 recites "further comprising genotyping [donor, recipient, or both donor and recipient] prior to the determining in step (d)." The written description and claims do not disclose any unconventional application of further genotyping prior to determining an amount of donor-specific cell-free nucleic acids in the biological sample (as recited in claim step 1(d)), or any way in which the prior genotyping improves upon the recited conventional methods. The only relevant disclosure in the written description states that "[i]n some embodiments, both the donor and recipient will be genotyped prior to transplantation."   B0001-B0024 ('652 Patent) at B0013, 8:55-56; *see also id.* at B0016, 13:2-3 (same). This, however, is only a high-level generalization that does not provide any improvement over the routine and conventional techniques as recited in independent claim 1 from which the dependent claim depends.

### 8. Dependent Claims Reciting Certain Concentrations Of Cell-Free Nucleic Acids In The Sample

195.    Regarding the '497 Patent, dependent claim 20 recites "the determining comprises detecting donor-specific circulating cell-free nucleic acids from the solid

A110

organ transplant wherein the donor-specific circulating cell-free nucleic acids from the solid organ transplant make up between 0.03% and 8.0% of the total circulating cell-free nucleic acids in the biological sample."

196.   Regarding the '607 Patent, dependent claims 7 and 8 recite the "quantified amount of said kidney transplant-derived [cfDNA] …" comprises certain percentages "of said total circulating [cfDNA]" in the samples, which are "between 1.5% and 8%" (claim 7) and "at least 0.05%" (claim 8), respectively.

197.   As explained in section VII.B.4. above, the ability to detect any of these concentrations of cell-free nucleic acids in a sample is an inherent feature of the standard and conventional methods and instruments recited in the Patent claims. Neither the Patents' written description nor claims identify any nonconventional or innovative use of these conventional techniques that renders them able to detect or quantify cfDNA at the recited concentrations when they would not otherwise be able to do so. Accordingly, there is nothing nonconventional or innovative in the limitations recited in '497 Patent claim 20 and '607 Patent claims 7, 8, 9, and 10.

### E.   Concluding Opinions Regarding Conventionality of the Recited Combination of Laboratory Techniques

198.   In my opinion, based on my review of the Patents and understanding of the state of the art at the time the Patents were filed, the claimed methods of the Patents employ routine and conventional techniques already in use to detect the natural phenomenon of transplant cfDNA. The same techniques recited in the

A111

Patents were already in use for detecting fetal, cancer, and pathogen cfDNA, and those POSAs using the techniques for those applications recognized they would be equally applied in the transplant space.

199. The Patents' claims do not purport to improve upon or describe any nonconventional use of the recited existing combination of laboratory techniques. From the perspective of a POSA in the 2009 timeframe, the combination of laboratory techniques recited in the Patents was well understood, routine and conventional, and already in use to detect a range of natural phenomena.

## VIII. THE PATENT METHODS DO NOT CREATE ANY NEW PREPARATION

200. As explained above, the Standard Patents are directed to the steps of (1) obtaining biological samples containing cell-free nucleic acids from a transplant recipient; (2) genotyping the transplant donor and/or recipient to establish profiles of genetic polymorphisms (or SNPs)[21]; (3) performing multiplex or high-throughput sequencing of the cell-free nucleic acids to detect the genotyped polymorphisms (or SNPs); and (4) quantifying the transplant (donor-derived) cell-free nucleic acids in the sample using the genetic differences in the sequences. The method claims are not directed to a novel method of preparing a new composition. The claimed method steps do nothing more than observe that cell-free DNA is present in a transplant

---

[21] The '607 Patent further recites selectively amplifying at least 1000 SNPs by PCR.

A112

patient, and correlate the presence of the cell-free DNA with transplant rejection, using a conventional combination of techniques.

201. The claims recite the step of obtaining a biological sample containing cell-free nucleic acids from a transplant recipient. This step does not result in a novel composition, as it merely involves obtaining a naturally-occurring sample from a patient.

202. The claims also recite steps of genotyping the transplant donor and/or recipient to establish profiles of genetic polymorphisms and performing multiplex or high-throughput sequencing of the cell-free nucleic acids to detect the genotyped polymorphisms (or SNPs). The '607 Patent claims further recite selectively amplifying at least 1,000 SNPs by PCR in order to detect them. These steps use well-understood, routine and conventional—indeed commercially available—techniques for analyzing the naturally-occurring sample. They do not change the relative amounts of the transplant donor-specific and transplant recipient cfDNA being quantified in the claimed method.

203. Finally, the claims require quantifying the transplant (donor-specific) cell-free nucleic acids in the sample using the genetic differences in the sequences. This step also does not result in a new composition or preparation. As explained above, this quantification step is broadly recited with no further specificity and involves standard techniques for quantifying nucleic acids. This step also does not

A113

change the relative amounts of the transplant donor-specific and transplant recipient

cfDNA being quantified in the claimed method.

*     *     *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: __June 11, 2020_____     _____

Professor John Quackenbush

A114

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally-spaced typeface and includes 2,595 words, excluding the parts of the brief exempted by the Rules.

Dated:  February 20, 2024                              /s/ Deanne E. Maynard

ny-2689150